## IN THE UNTIED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# 744-70849

| | | |
|---|---|---|
| EXECUTIVE CAR WASH OF MAPLE GLEN | : | |
| | : | |
| v. | : | |
| | : | **NO. 02-CV-3747** |
| ENVIRONMENTAL, INC. | : | |
| and | : | |
| ENVIRONMENTAL HAZARD SERVICES, INC. | : | |
| | : | |

## O R D E R

AND NOW, this        day of                   , 2004, upon consideration of Defendants Environmental, Inc. and Environmental Hazard Services, Inc.'s Motion for Summary Judgment, it is hereby **ORDERED** that said Motion for Summary Judgment be **GRANTED**.  It is further **ORDERED** and **DECREED** that Plaintiff's action against moving Defendants be dismissed.

**BY THE COURT:**

_____
U.S.D.J.

PH074404.1

## IN THE UNTIED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# 744-70849

|  |  |  |
|---|---|---|
| EXECUTIVE CAR WASH OF MAPLE GLEN | : | |
| | : | |
| v. | : | |
| | : | NO. 02-CV-3747 |
| ENVIRONMENTAL, INC. | : | |
| and | : | |
| ENVIRONMENTAL HAZARD SERVICES, INC. | : | |
| | : | |

## DEFENDANTS ENVIRONMENTAL, INC. AND ENVIRONMENTAL
## HAZARD SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

Defendants, Environmental, Inc ("Environmental") and Environmental Hazard Services, Inc. ("Hazard") by and through their undersigned counsel, Marks, O'Neill, O'Brien & Courtney, P.C. hereby move this honorable court to enter summary judgment in their favor and aver the following in support thereof:

1.    In 2002, plaintiff filed a complaint against Defendants in the District Court for the Eastern District of Pennsylvania.

2.    Plaintiff's complaint alleges four causes of action against the Defendants; breach of contract, negligence, professional malpractice and negligent representation.

3.    The litigation surrounds a property formerly owned by the plaintiff located at 400 Limekiln Pike (also known as 601 Welsh Road), Maple Glen, Montgomery County, Pennsylvania.

4.    In brief, Plaintiff's complaint alleges that Defendant Hazard failed to locate underground storage tanks upon the property in question, which lead Plaintiff to allegedly suffer damages in the form of clean up costs, property devaluation and lost rents.

5.     Plaintiff Executive Car Wash of Maple Glen is a closely held corporation whose sole shareholder is Charles Pappas, M.D.  (A true and correct copy of Dr. Pappas' deposition transcript, page 16, is attached hereto as **Exhibit "A"**.)

6.     Defendant Hazard was a closely held corporation whose sole shareholder was Mr. John Carney.  In 1996, Mr. Carney sold Defendant Hazard and formed Defendant Environmental. Mr. Carney remains the sole shareholder of Defendant Environmental. (A true and correct copy of the deposition transcript of John Carney, pages 8-9, 16-17 is attached hereto as **Exhibit "B"**.)

7.     Plaintiff purchased the property in question at a sheriff's sale in 1988.  At the time of the purchase, the property maintained a car wash upon it.  <u>See</u> **Exhibit "A"**, pages 26 and 31.

8.     In 1989, plaintiff learned through a title search that there had been an Atlantic Richfield (ARCO) gas station previously upon the property which had later been converted into the car wash in the early 1980's.  <u>See</u> **Exhibit "A"**, pages 26 through 30.

9.     Plaintiff initially purchased the property for a purchase price of approximately $350,000.00.  <u>See</u> **Exhibit "A"**, page 28.

10.     Plaintiff obtained financing for the property at Fidelity Bank.  Fidelity Bank did not require a Phase One environmental assessment of the property prior to Dr. Pappas obtaining this financing.  <u>See</u> **Exhibit "A"**, page 28.

11.     In 1992, plaintiff refinanced the property with Fidelity Bank.  According to testimony, Fidelity required a Phase One environmental assessment to be performed on the property as a prerequisite of refinancing.  <u>See</u> **Exhibit "A"**, page 31.

12.     Plaintiff thereby contracted with Defendant Hazard to perform the Phase One environmental assessment on the premises in question.

13.     A Phase One assessment is performed to identify potential risks which are present upon the property and are solely designed to determine whether hazards potentially exist on the surface of the property and to provide background for the Phase Two assessment, if necessary. (A true and correct copy of the Environmental Hazard Services, Inc. environmental site assessment dated December 10, 1992, is attached hereto as **Exhibit "C"**.)

14.     In an effort to identify any underground storage tanks potentially upon the property, Defendant Hazard contracted with Atlantic Petroleum Technologies, Inc. to perform a site survey using a Fero Magnetic locator.  These locators are used  to identify any buried metal objects.  <u>See</u> **Exhibit "B"** page 44.

15.     Atlantic Petroleum Technologies, Inc. conducted its site survey using a Fero Magnetic locator on December 4, 1992.  Based upon the test results, Atlantic Petroleum opined that any and all commercial storage tanks at the property had previously been removed.  (A true and correct copy of Atlantic Petroleum Technologies, Inc.'s report dated December 7, 1992 is attached hereto as **Exhibit "D"**.)

16.     Upon completing the Phase One assessment, and relying predominantly upon the report generated by Atlantic Petroleum Technologies, Inc., Hazard issued a report entitled "Environmental Site Assessment" which had been created by Richard Berkes, a former employee of Hazard.  The report is dated December 10, 1992.  <u>See</u> **Exhibit "B"**.

17.     In his report, Mr. Berkes detailed that "Based on (the Fero Magnetic locator test performed by Atlantic Petroleum) the storage tanks have been removed."  <u>See</u> **Exhibit "B"**, page 25.

18.     Furthermore, Mr. Berkes notated that he found no other evidence of underground storage tanks, fill caps, vent pipes, concrete pads, or distribution equipment. <u>See</u> **Exhibit "B"**, page 25.

19.     Notwithstanding Atlantic Petroleum Technologies, Inc.'s failure to properly find the underground storage tanks using the Fero Magnetic locator, plaintiff obtained all desired financing associated with its refinancing application with Fidelity Bank in 1992. (A true and correct copy of the Mortgage and Security Agreement filed with the Montgomery County Recorder or Deeds attached hereto as **Exhibit "E"**.)

20.     On April 15, 1999, plaintiff and Charles Pappas, individually entered into a Lease Purchase Agreement with Sannco Ventures, LLC and Michael Sannuti, individually. This Lease Purchase Agreement provided Sannco and Mr. Sannuti the ability to sell their option to buy the property. (A true and correct copy of the Lease Purchase Agreement is attached hereto as **Exhibit "F"**.)

21.     In 2001, Mr. Sannuti desired to sell his option to buy the property in question to Mr. Reinhards Bets. Prior to the sale of the option to buy, Mr. Sannuti bore an obligation to Mr. Bets to perform another Phase One assessment of the property. (A true and correct copy of the deposition transcript of Michael Sannuti, page 69, is attached hereto as **Exhibit "G"**.)

22.     In an effort to streamline the completion of this Phase One assessment, Mr. Sannuti contacted Environmental, Inc. as successor to Hazard, to perform the Phase One assessment.

23.     On or about September 6, 2000, Mr. Carney, this time on the behalf of Environmental, Inc., performed another Phase One Site assessment upon the property in question. Once again, no underground gasoline storage tanks were found at the site. (A true and correct copy of the September 6, 2000 Environmental Site Assessment is attached hereto as **Exhibit "H"**.)

24.     Mr. Carney predominantly relied upon the report generated by Hazard and Atlantic Petroleum Technologies, Inc. in 1992 when making his assessment in 2000.

25.     For reasons undetermined, Mr. Bets refused to accept this new report, and therefore, Mr. Sannuti hired Bell Environmental to conduct another Phase One assessment.  As a result of the tests that Bell Environmental conducted, which included tests borings, commercial underground storage tanks were found upon the site in question.  See **Exhibit "G"**, pages 70 through 72.

26.     Upon further investigation by Environmental and Terra Environmental, Inc., three underground storage tanks with the capacity of 10,000 gallons each, were found at the site in question.  All three tanks were filled with concrete, with contaminated soil evident on the top of the tanks, on the sides of the tanks and below the tanks.  (A true and correct copy of a letter written by John Carney dated October 27, 2000, is attached hereto as **Exhibit "I"**.)

27.     The underground storage tanks in question were approximately five feet below grade.  Typically, underground storage tanks are buried no more than three feet below the surface. Fero Magnetic locators are only able to detect metal two to three feet below the ground surface. As a result, the Fero Magnetic test occurring in 1992 did not detect the presence of the underground storage tanks.  See **Exhibit "B"**, pages 94 through 98.

28.     On January 8, 2001, Dr. Pappas sold the property in question to Reinhards Bets for a total of $418,000.00.  Mr. Bets also provided Mr. Sannuti with $238,000.00 for the option to buy the property.  See **Exhibit "A"**, pages 90 through 92.

29.     On May 1, 2002, Dr. Pappas and Executive Car Wash of Maple Glen entered into a Settlement Agreement and Release with Atlantic Richfield.  In this release, Atlantic Richfield agrees to pay the sum of $99,000.00 to Charles Pappas in exchange for a release of all claims regarding the underground storage tanks and subsequent contamination on the property in question.  (A true

and correct copy of the May 1, 2002 Settlement Agreement and Release is attached hereto as **Exhibit "J"**.)

30.    Notwithstanding having gained a significant settlement with Atlantic Richfield and failing to file suit against Defendant Atlantic Petroleum Technologies, Inc., plaintiff now brings suit for damages against defendants for clean up costs and property devaluation.

31.    Rule 56 of the Federal Rules of Civil Procedure governing summary judgment provides that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

32.    A viable cause of action for negligence must demonstrate four elements: 1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risk; 2) failure on the part of the Defendant to conform to that standard of conduct, i.e., a breach of duty; 3) a reasonably close causal connection between the breach of duty and the injury sustained; and 4) actual loss or damages that result from the breach.  Ney v. Axelrod, 723 A.2d 719 (Pa.Super.1999) (citations omitted).

33.    When the relevant facts are not in dispute and the remoteness of the causal connection between negligence and the injury clearly appears, the issue of proximate cause is one of law for the court to determine.  Cotter v. Bell, 208 A.2d 216, 218 (1965).

34.    "Significantly, one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter, is that, where there is an injury, the law provides a remedy."  Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267

F.3d 340, 351 (3d Cir. 2001) citing *37 Pennsylvania Law Encyclopedia,* Torts §§ 4, at 120 (1961) ('For every legal wrong there must be a correlative legal right.') (citations omitted).

35.    "Thus, an identifiable and compensable injury is essential to the existence of tort liability."  Id.

36.    "Where a contractual 'breach occurs, contract law seeks to give to the nonbreaching party the benefit of his or her bargain, to put him or her in the position he or she would have been in had there been no breach.'"  Id., citing 1 *Summary of Pennsylvania Jurisprudence* Torts §§ 1.1 (2d ed.1999).

37.    In regards to Plaintiff's claims based under tort law, Plaintiff has produced no evidence which indicates that the contamination surrounding the tank was caused by, or otherwise exacerbated by the Defendants' failure to find the tanks in question.

38.    Plaintiff has only produced evidence, as provided by their supplemental Answers to Interrogatories Directed at Plaintiff, that their expert, Dr. Robert Manion, "will testify that the underground storage tanks should have been discovered and/or that as a part of the Phase I examination, that it should have been noted that additional investigation was required, said investigation which would have uncovered underground storage tanks."  (A true and correct copy of Plaintiff's Supplemental Answers to Interrogatories Directed to Plaintiff is attached hereto as **Exhibit "K"**).

39.    While this opinion may speak to Defendants' duty and breach of that duty, it does not speak at all toward whether or not the allegedly negligent actions of the Defendants actually caused the alleged harm to the Plaintiff.

40.    Plaintiff has provided no evidence as to the timing of the contamination; i.e. whether or not the contamination occurred before or after the 1992 Phase I performed by Defendant Hazard.  Such evidence is vital to Plaintiff's claim, because if the Plaintiff cannot establish that the

Page -7-

contamination occurred after the 1992 Phase I, any such damages caused by the contamination were not the result of Defendants's inability to discover the tanks in question.

41.     For example, Plaintiff has not established that the property in question devalued solely, or in part, as a result of Defendants' failure to find the underground storage tanks.  The evidence demonstrates that the tanks had been buried on the property at least since the early 1980s, and that even if the Defendants found the tanks in 1992, the property would have devalued anyway at that time.

42.     Plaintiff has failed to show, either through expert testimony or through an expert report, that property devaluation would not have occurred "but for" the negligence of the Defendants.  On the contrary, Defendants' alleged failure to find the tanks had the actual result of providing the Plaintiff with an unintentional benefit; i.e., the ability to gain financing for the property in 1992 that would have most likely been denied had the underground gasoline storage tanks actually been discovered.

43.     It is inarguable that even if the tanks had been found in 1992, Plaintiff would have gone through the same expenses for removal of the tanks and clean up of all contamination. Plaintiff has provided no evidence or expert report which opines that removal of the tanks and the subsequent clean up was more expensive in 1992 than it was in 2001, or that the contamination had somehow spread during the time period from 1992 to 2000 which caused additional clean up and tank removal expenses to Plaintiff.

44.     These facts are also devastating to Plaintiff's breach of contract claim.  Plaintiff has failed to demonstrate any expectation damages due as a result of Defendants' alleged breach of the contract.

45.     For example, under modern contract law, a non breaching party is entitled to compensatory damages.  See Hahn v. Atlantic Richfield Co. 625 A.2d 1095, 1104 (3d. Cir. 1980).

46.     The goal of compensatory damages is to put the non breaching party into as good a position as the party would have been if the breaching party fully performed.  Id.

47.     Plaintiff has not established a difference between the position it was in 1992 and the position maintained in 2001, right after the underground storage tanks were discovered.

48.     As mentioned above, no evidence exists demonstrating that the cost of cleanup cost more in 2001 as a result of the Defendants not finding the underground storage tanks, or that the property value decreased more than it should have as a direct result of Defendants failing to find the underground storage tanks.  Plaintiffs would have been forced to incur identical costs in 1992 if the tanks had been found then, rather than in 2000.

49.     As a result, Plaintiff has not established that it is entitled to any damages under contract law as a result of Defendants' alleged breach.

50.     Plaintiff has not produced any evidence of damages which were caused by, or otherwise the result of any alleged tort or breach of contract by the defendants.  As a result, summary judgment in favor of the Defendants is appropriate in this instance.

51.     Alternatively, Plaintiffs cannot demonstrate the Defendants' liability in this instance, under the doctrine of Respondeat Superior.

52.     Even though an agency relationship may exist, it does not necessarily mean the principal is liable for the negligent acts of the agent.  See Juerbe v. City of Philadelphia, 431 A.2d 1073, 1076 (Pa. Super. 1981) (citations omitted).

53.     A principal and agent may maintain a status of either independent contractor or of master and servant.  Id.

54.     In order to hold a principal liable for the negligent acts of the agent, "It must be shown that the master has the right to control not only the results of the servant's work but also the very manner in which the work is to be done."  Id.

55.    Principals may only be vicariously liable for the negligence of the agent if a master and servant relationship exists.  Id.

56.    "If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent."  Id.  Thus, in order for the Defendants to be held vicariously liable for the alleged  negligent acts of Atlantic Petroleum Technologies, Inc. or of Atlantic Richfield, or any of their employees, the relationship between the Defendants and Atlantic Petroleum Technologies, Inc. and Atlantic Richfield must have been that of master and servant.

57.    In this case, the evidence demonstrates that Defendants contracted with Atlantic Petroleum Technologies, Inc. in 1992 to perform a fero magnetic test to determine whether or not there were underground storage tanks present upon the property in question.  Defendants relied upon this test's findings when making their findings regarding the Phase I reports in 1992 and in 2000.

58.    Obviously, the evidence demonstrates that Atlantic Petroleum Technologies, Inc. did not properly perform the test in question.  As a result, all liability in this instance should fall upon them, and not the Defendants, since it is inarguable that the Defendants and Atlantic Petroleum Technologies Inc. were in a contractual relationship, and were not master/servant.

59.    Furthermore, the evidence also dictates that any and all leaking which occurred was a result of the actions/inactions of Atlantic Richfield.  This proposition is further supported by the fact that Atlantic Richfield and the plaintiff reached a settlement regarding these tanks and subsequent contamination.  See **Exhibit "J"**.

60.    Defendants cannot be liable, by law, for the actions/inaction of Atlantic Richfield, since there is absolutely no agency relationship between the entities. Plaintiff is simply seeking a windfall for the negligence perpetrated by Atlantic Richfield.

**WHEREFORE**, Defendants Environmental, Inc. and Environmental Hazard Services, Inc., respectfully request this Honorable Court grant their Motion for Summary Judgment and that Plaintiff's action against moving Defendants be dismissed.

Respectfully Submitted,

**MARKS, O'NEILL, O'BRIEN &
COURTNEY, P. C.**

BY:_____
**Michael T. Hamilton, Esquire
Mark A. Schiavo, Esquire**
1880 John F. Kennedy Blvd., Suite 1200
Philadelphia, PA 19103
(215) 564-6688
Attorneys for Defendants

**IN THE UNTIED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

# 744-70849

|  |  |  |
|---|---|---|
| | : | |
| EXECUTIVE CAR WASH OF MAPLE GLEN | : | |
| | : | |
| v. | : | |
| | : | **NO. 02-CV-3747** |
| ENVIRONMENTAL, INC. | : | |
| and | : | |
| ENVIRONMENTAL HAZARD SERVICES, INC. | : | |
| | : | |

**DEFENDANTS ENVIRONMENTAL, INC. AND ENVIRONMENTAL**
**HAZARD SERVICES, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

I.    <u>Facts</u>

In 2002, Plaintiff filed a complaint against Defendants in the District Court for the Eastern District of Pennsylvania.  Plaintiff's complaint alleges four causes of action against the Defendants; breach of contract, negligence, professional malpractice and negligent representation.  The litigation surrounds a property formerly owned by the Plaintiff located at 400 Limekiln Pike (also known as 601 Welsh Road), Maple Glen, Montgomery County, Pennsylvania.  In brief, Plaintiff's complaint alleges that Defendant Hazard failed to locate underground storage tanks upon the property in question, which lead to Plaintiff allegedly suffer damages in the form of clean up costs and property devaluation.

Plaintiff Executive Car Wash of Maple Glen is a closely held corporation whose sole shareholder is Charles Pappas, M.D.  (A true and correct copy of Dr. Pappas' deposition transcript, page 16, is attached hereto as **Exhibit "A"**.  Defendant Hazard was a closely held corporation whose sole shareholder was Mr. John Carney.  In 1996, Mr. Carney sold Defendant Hazard and formed Defendant Environmental.  Mr. Carney remains the sole shareholder of Defendant

PH074404.1

Environmental. (A true and correct copy of the deposition transcript of John Carney, pages 8-9, 16-17 is attached hereto as **Exhibit "B"**.)

Plaintiff purchased the property in question at a sheriff's sale in 1988.  At the time of the purchase, the property maintained a car wash upon it.  See **Exhibit "A"**, pages 26 and 31.  In 1989, plaintiff learned through a title search that there had been an Atlantic Richfield gas station previously upon the property which had later been converted into  the car wash in the early 1980's. See **Exhibit "A"**, pages 26 through 30.

Plaintiff initially purchased the property for a price of approximately $350,000.00.  See **Exhibit "A"**, page 28.  Plaintiff obtained financing for the property at Fidelity Bank.  Fidelity Bank did not require a Phase One environmental assessment of the property prior to Dr. Pappas obtaining this financing.  See **Exhibit "A"**, page 28.  In 1992, plaintiff refinanced the property with Fidelity Bank.  According to testimony, Fidelity required a Phase One environmental assessment to be performed on the property as a prerequisite of refinancing.  See **Exhibit "A"**, page 31.

Plaintiff thereby contracted with Hazard to perform the Phase One environmental assessment on the premises in question.  A Phase One assessment is performed to "identify potential risks which are present upon the property.  If (sic) is solely designed to determine whether hazards potentially exist on the property and to provide background for the Phase Two assessment, if necessary."  (A true and correct copy of the Environmental Hazard Services, Inc. environmental site assessment dated December 10, 1992, page 3, is attached hereto as **Exhibit "C"**.)

As a result, Defendant Hazard contracted with Atlantic Petroleum Technologies, Inc. to perform a site survey using a Fero Magnetic locator to identify any buried metal objects, including potential underground storage tanks.  See **Exhibit "B"** page 44.  Atlantic Petroleum Technologies, Inc. conducted its site survey using a Fero Magnetic locator on December 4, 1992.  Based upon

Page -2-

the test results, Atlantic Petroleum opined that any and all commercial storage tanks at the property had previously been removed.   (A true and correct copy of Atlantic Petroleum Technologies, Inc.'s report dated December 7, 1992 is attached hereto as **Exhibit "D"**.)

Upon completing the Phase One assessment, and relying  upon the report generated by Atlantic Petroleum Technologies, Inc., Hazard issued a report entitled "Environmental Site Assessment" which had been created by Richard Berkes, a former employee of Hazard.  The report is dated December 10, 1992.  See **Exhibit "B"**.  In his report, Mr. Berkes detailed that "Based on (the Fero Magnetic locator test performed by Atlantic Petroleum) the storage tanks have been removed."  See **Exhibit "B"**, page  25.  Furthermore, Mr. Burkes notated that he found no other evidence of underground storage tanks, fill caps, vent pipes, concrete pads, or distribution equipment.  See **Exhibit "B"**, page 25.  Notwithstanding Atlantic Petroleum Technologies, Inc.'s failure to properly find the underground storage tanks using the Fero Magnetic locator, plaintiff obtained all desired financing associated with its refinancing application with Fidelity Bank in 1992. (A true and correct copy of the  Mortgage and Security Agreement filed with the Montgomery County Recorder or Deeds attached hereto as **Exhibit "E"**.)

On April 15, 1999, plaintiff and Charles Pappas, individually entered into a Lease Purchase Agreement with Sannco Ventures, LLC and Michael Sannuti, individually.  This Lease Purchase Agreement provided Sannco and Mr. Sannuti the ability to sell their option to buy the property. (A true and correct copy of the Lease Purchase Agreement is attached hereto as **Exhibit "F"**.) In 2001, Mr. Sannuti desired to sell his option to buy the property in question to Mr. Reinhards Bets.  Prior to the sale of the option to buy, Mr. Sannuti bore an obligation to Mr. Bets to perform another Phase One assessment of the property.   (A true and correct copy of the deposition transcript of Michael Sannuti, page 69, is attached hereto as **Exhibit "G"**.)

In an effort to streamline the completion of this Phase One assessment, Mr. Sannuti contacted Environmental, Inc. as successor to Hazard, to perform the Phase One assessment. On or about September 6, 2000, Mr. Carney, this time on the behalf of Environmental, Inc., performed another Phase One Site assessment upon the property in question. Once again, no underground gasoline storage tanks were found at the site. (A true and correct copy of the September 6, 2000 Environmental Site Assessment is attached hereto as **Exhibit "H".**) Mr. Carney predominantly relied upon the report generated by Hazard and Atlantic Petroleum Technologies, Inc. in 1992 when making his assessment in 2000.

For reasons undetermined, Mr. Bets refused to accept this new report, and therefore, Mr. Sannuti hired Bell Environmental to conduct another Phase One assessment. As a result of the tests that Bell Environmental conducted, commercial underground gasoline storage tanks were found upon the site in question. See **Exhibit "G"**, pages 70 through 72. Upon further investigation by Environmental and Terra Environmental, Inc., three underground storage tanks with the capacity of 10,000 gallons each, were found at the site in question. All three tanks were filled with concrete, with contaminated soil evident on the top of the tanks, on the sides of the tanks and below the tanks. (A true and correct copy of a letter written by John Carney dated October 27, 2000, is attached hereto as **Exhibit "I".**) The underground storage tanks in question were approximately five feet below grade. Typically, underground storage tanks are buried no more than three feet below the surface. Fero Magnetic locators are only able to detect metal two to three feet below the ground surface. As a result, the Fero Magnetic test occurring in 1992 did not detect the presence of the underground storage tanks. See **Exhibit "B"**, pages 94 through 98.

On January 8, 2001, Dr. Pappas sold the property in question to Reinhards Bets for a total of $418,000.00.  Mr. Bets also provided Mr. Sannuti with $238,000.00 for the option to buy the property.  <u>See</u> **Exhibit "A"**, pages 90 through 92.

On May 1, 2002, Dr. Pappas and Executive Car Wash of Maple Glen entered into a Settlement Agreement and Release with Atlantic Richfield.  In this release, Atlantic Richfield agrees to pay the sum of $99,000.00 to Charles Pappas in exchange for a release of all claims regarding the underground storage tanks and subsequent contamination on the property in question.  (A true and correct copy of the May 1, 2002 Settlement Agreement and Release is attached hereto as **Exhibit "J"**.)  Notwithstanding having gained a significant settlement with Atlantic Richfield and failing to file suit against Defendant Atlantic Petroleum Technologies, Inc., plaintiff now brings suit for damages against defendants for clean up costs and property devaluation.

**II**    **Standard of Review**

Federal Rule of Civil Procedure 56 states, in pertinent part, a party is entitled to Summary Judgment where "there is no genuine issue as to any material fact."  <u>Lawrence vs. National Westminster Bank of New Jersey</u>, 98 F.3d 61, 65 (3d Cir. 1996); Fed. R.Civ. P. 56 (c).  An issue is genuine if the fact-finder could reasonably hold in the non-movant's favor with respect to that issue and a fact is material if it influences the outcome under the governing law.  <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 247-48, 106 S.Ct. 2505 (1986).

In making its determination, the Court must review the facts in the light most favorable to the non-moving party.  <u>Id.</u> at 248.  However, the non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  <u>Williams v. Borough of W. Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989).  The moving party need only show

that the non-moving parties' evidence is insufficient to carry its burden of persuasion at trial to meet the burden of Summary Judgement.  <u>Lawrence</u>, *supra* 98 F.3d at 65.

**III.  <u>Legal Argument</u>**

    **A.  Plaintiff has not produced any evidence whatsoever which demonstrates a causal relationship between Defendants' allegedly tortious acts/inactions and the damages allegedly suffered by Plaintiff.**

In this case, Plaintiff raises four causes of action, three of which are based under tort theory of liability.  These causes of action cited by Plaintiff are Negligence, Negligent Representation and Professional Malpractice.

"Significantly, one of the most venerable principles in Pennsylvania jurisprudence, and in most common law jurisdictions for that matter, is that, where there is an injury, the law provides a remedy."  <u>Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.</u>, 267 F.3d 340, 351 (3d Cir. 2001) citing *37 Pennsylvania Law Encyclopedia,* Torts §§ 4, at 120 (1961) ('For every legal wrong there must be a correlative legal right.') (citations omitted).  "**Thus, an identifiable and compensable injury is essential to the existence of tort liability**."  <u>Id.</u>

A viable cause of action for negligence must demonstrate four elements: 1) a duty or obligation recognized by the law that requires an actor to conform his actions to a standard of conduct for the protection of others against unreasonable risk; 2) failure on the part of the Defendant to conform to that standard of conduct, i.e., a breach of duty; 3) a reasonably close causal connection between the breach of duty and the injury sustained; and 4) actual loss or damages that result from the breach.  <u>Ney v. Axelrod</u>, 723 A.2d 719 (Pa.Super.1999) (citations omitted).  When the relevant facts are not in dispute and the remoteness of the causal connection between negligence and the injury clearly appears, the issue of proximate cause is one of law for the court to determine.  <u>Cotter v. Bell</u>, 208 A.2d 216, 218 (1965).

Page -6-

The causal connection between a defendant's breach and the injury sustained is also required in Professional Malpractice actions.  In Crivellaro v. Pennsylvania Power & Light Co., 491 A.2d 207 (Pa.Super.1985), the Superior Court of Pennsylvania set forth the elements for a Professional Malpractice action as: (1) Defendant must owe a duty to the Plaintiff, (2) that Defendant breached that duty and (3) **that this breach was the proximate cause of Plaintiff's alleged injuries.**   Id. at 211 (emphasis added) citing Vattimo v. Lower Bucks Hospital, Inc., 465 A.2d 1231 (1983); Rubin v. Hamot Medical Center, 478 A.2d 869 (1984).

The notion of causation is well established within tort law.  In Hamil v. Bashline, 392 A.2d 1280 (1978), the Pennsylvania Supreme Court explained in detail the legal theory behind causation principles. Specifically, the Supreme Court stated:

> the mere occurrence of an injury  does not prove negligence and that an admittedly negligent act does not necessarily entail liability; rather even when it is established that the defendant breached some duty of care owed the plaintiff, **it is incumbent on a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury. Stated another way, the defendant's conduct must be shown to have been the proximate cause of plaintiff's injury.**

Id. at 1284 (emphasis added); citing Flickinger Estate v. Ritsky, 305 A.2d 40 (1973); Dornan v. Johnston, 218 A.2d 808 (1966); Cuthbert v. Philadelphia, 209 A.2d 261 (1965); Gift v. Palmer, 141 A.2d 408 (1958); Fries v. Ritter, 112 A.2d 189 (1955).

In regards to Plaintiff's claims based under tort law, Plaintiff has produced no evidence which indicates that the contamination surrounding the tank was caused by, or otherwise exacerbated by the Defendants' failure to find the tanks in question.  Plaintiff has only produced evidence, as provided by their Supplemental Answers to Interrogatories Directed at Plaintiff, that their expert, Dr. Robert Manion, "will testify that the underground storage tanks should have been discovered and/or that as a part of the Phase I examination, that it should have been noted that additional investigation was required, said investigation which would have uncovered underground

storage tanks." (A true and correct copy of Plaintiff's Supplemental Answers to Interrogatories Directed to Plaintiff is attached hereto as **Exhibit "K"**). While this opinion may speak to Defendants' duty and breach of that duty, **it does not speak at all toward whether or not the allegedly tortious actions of the Defendants actually caused the alleged harm to the Plaintiff**. Plaintiff has provided no evidence as to the timing of the contamination; i.e. whether or not the contamination occurred before or after the 1992 Phase I performed by Defendant Hazard. Such evidence is vital to Plaintiff's claim, because if the Plaintiff cannot establish that the contamination occurred after the 1992 Phase I, any such damages caused by the contamination were not the result of Defendants's inability to discover the tanks in question.

Furthermore, Plaintiff has not established that the property in question devalued solely, or in part, as a result of Defendants' failure to find the underground storage tanks. While it is logical to assume that the property devalued as a result of the underground storage tanks buried there, it does not assume that the Defendants in this matter bear the responsibility for that fact. The evidence demonstrates that the tanks had been buried on the property when the property maintained an Atlantic Richfield gas station, and that even if the Defendants found the tanks in 1992, the property would have devalued anyway. **Under the notions of causation as explained above, Atlantic Richfield bears the responsibility for the buried underground storage tanks, and not the Defendants.** Plaintiff has failed to show, either through expert testimony or through an expert report, that property devaluation would not occurred "but for" the negligence of the Defendants. On the contrary, Defendants' alleged failure to find the tanks had the actual result of providing the Plaintiff with an unintentional benefit; i.e., the ability to gain financing for the property in 1992 that would have most likely been denied had the underground gasoline storage tanks actually been discovered.

It is inarguable that even if the tanks had been found in 1992, Plaintiff would have gone through the same expenses for removal of the tanks and clean up of all contamination. Plaintiff has provided no evidence or expert report which opines that removal of the tanks and the subsequent clean up was more expensive in 1992 than it was in 2001, or that the contamination had somehow spread during the time period from 1992 to 2000 which caused additional clean up and tank removal expenses to Plaintiff.

**B.    Plaintiff also cannot establish damages based upon a breach of contract cause of action.**

The above facts are also devastating to Plaintiff's breach of contract claim. Plaintiff has failed to demonstrate any expectation damages due as a result of Defendants' alleged breach of the contract.

"It is well established that where a contractual 'breach occurs, contract law seeks to give to the nonbreaching party the benefit of his or her bargain, to put him or her in the position he or she would have been in had there been no breach.'" Hahn v. Atlantic Richfield Co. 625 A.2d 1095, 1104 (3d. Cir. 1980), citing 1 *Summary of Pennsylvania Jurisprudence* Torts §§ 1.1 (2d ed.1999). These damages, under modern contract law, have been termed compensatory damages. See Id. The goal of compensatory damages is to put the non breaching party into as good a position as the party would have been if the breaching party fully performed. Id.

Plaintiff has not established a difference between the position it was in during 1992 and the position Plaintiff maintained in 2001, immediately after the underground storage tanks were discovered. As mentioned above, no evidence exists demonstrating that the cost of cleanup cost more in 2001 as a result of the Defendants not finding the underground storage tanks, or that the property value decreased more than it should have as a direct result of Defendants failing to find the underground storage tanks. Plaintiffs would have been forced to incur identical costs in 1992

if the tanks had been found then, rather than in 2000. As a result, Plaintiff has not established that

it is entitled to any damages under contract law as a result of Defendants' alleged breach.

C.     **Alternatively, Plaintiffs cannot demonstrate the Defendants' liability in this instance under the doctrine of Respondeat Superior.**

Even though an agency relationship may exist, it does not necessarily mean the principal

is liable for the negligent acts of the agent. See <u>Juerbe v. City of Philadelphia</u>, 431 A.2d 1073,

1076 (Pa. Super. 1981) (citations omitted). A principal and agent may maintain a status of either

independent contractor or of master and servant. <u>Id</u>. Principals may only be vicariously liable for

the negligence of the agent if a master and servant relationship exists. <u>Id.</u> In order to hold a

principal liable for the negligent acts of the agent, "It must be shown that the master has the right

to control not only the results of the servant's work but also the very manner in which the work

is to be done." <u>Id.</u> "If a particular agent is not a servant, the principal is not considered a master

who may be held vicariously liable for the negligent acts of the agent." <u>Id.</u> Thus, in order for the

Defendants to be held vicariously liable for the alleged  negligent acts of Atlantic Petroleum

Technologies, Inc. or of Atlantic Richfield, or any of their employees, the relationship between the

Defendants and Atlantic Petroleum Technologies, Inc. and Atlantic Richfield must have been that

of master and servant.

In this case, the evidence demonstrates that Defendants contracted with Atlantic Petroleum

Technologies, Inc. in 1992 to perform a fero magnetic test to determine whether or not there were

underground storage tanks present upon the property in question. According to the evidence,

Defendants relied upon this test's findings when making their findings regarding the Phase I reports

in 1992 and in 2000. Obviously, the evidence demonstrates that Atlantic Petroleum Technologies,

Inc. did not properly perform the test in question. As a result, all liability in this instance should

fall upon Atlantic Petroleum Technologies, Inc., and not the Defendants, since it is inarguable that

the Defendants and Atlantic Petroleum Technologies Inc. were in a contractual relationship, and were not master/servant.

Furthermore, the evidence also dictates that any and all leaking which occurred was a result of the actions/inactions of Atlantic Richfield. This proposition is fully supported by the fact that Atlantic Richfield and the plaintiff reached a settlement regarding these tanks and subsequent contamination. See **Exhibit "J"**. Defendants cannot be liable, by law, for the actions/inactions of Atlantic Richfield, since there is absolutely no agency relationship between the entities. Plaintiff is simply seeking a windfall for the negligence perpetrated by Atlantic Richfield.

**IV.**    Conclusion

For the above mentioned reasons, Defendants Environmental, Inc. and Environmental Hazard Services, Inc., respectfully request this Honorable Court grant their Motion for Summary Judgment and that Plaintiff's action against moving Defendants be dismissed.

Respectfully Submitted,

**MARKS, O'NEILL, O'BRIEN &
COURTNEY, P. C.**

BY:_____

**Michael T. Hamilton, Esquire
Mark A. Schiavo, Esquire**
1880 John F. Kennedy Blvd., Suite 1200
Philadelphia, PA 19103
(215) 564-6688
Attorneys for Defendants

**IN THE UNTIED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSLVANIA**

# 744-70849

|  |  |  |
|---|---|---|
| | : | |
| EXECUTIVE CAR WASH OF MAPLE GLEN | : | |
| | : | |
| v. | : | |
| | : | **NO. 02-CV-3747** |
| ENVIRONMENTAL, INC. | : | |
| and | : | |
| ENVIRONMENTAL HAZARD SERVICES, INC. | : | |
| | : | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this **15th** day of **March, 2004** a true and correct copy of the

foregoing **Motion for Summary Judgment** was served electronically on all parties of record.

**MARKS, O'NEILL, O'BRIEN
& COURTNEY, P.C.**

BY: _____

**Michael T. Hamilton, Esquire
Mark A. Schiavo, Esquire**
1880 JFK Boulevard, Suite 1200
Philadelphia, PA 19103
215-564-6688
Attorneys for Defendants

PH074404.1