# EXHIBIT "A"

14

1  have you held prior to today that you no
2  longer hold?
3      A.   At one point in the 1982
4  through 1990 timeframe I owned an
5  investment property at the seashore in
6  New Jersey.  And I owned a car wash
7  property in Maple Glen.
8      Q.   And is that the car wash
9  property that's at issue in this
10  litigation?
11     A.   Yes.
12     Q.   Are you a shareholder in any
13  privately-held companies presently?
14     A.   Presently, no.
15     Q.   Prior have you been a
16  shareholder in any privately-held
17  companies?
18     A.   Yes.
19     Q.   And what were they?
20     A.   I was a shareholder in a
21  company called Tri-State Quick Lube,
22  which was a corporation in which I was an
23  investor, whose purpose it was to
24  identify properties and open up

15

1  franchises in the quick lube business.
2      Q.   Is that like Jiffy Lube?
3      A.   Yes.
4      Q.   And when was that timeframe?
5      A.   Late '80s.
6      Q.   And how long were you in
7  that?
8      A.   A few years.
9      Q.   And did you divest yourself
10  of that?
11     A.   We were bought out of those
12  properties by the parent company, by the
13  Jiffy Lube parent, and at that time it
14  was Jiffy Lube and Pennzoil.
15     Q.   Are there any other
16  privately-held companies that you were an
17  owner of?
18     A.   I was an investor in a card
19  shuffling machine at one point in my
20  life.  I was intrigued with the
21  technology that was involved, and the
22  idea was brought to me by a friend who
23  asked for the investment and made me a
24  shareholder in the company.  And needless

16

1  to say, it has not gone very far.  But
2  the design of the company was to obviate
3  card counting at the blackjack tables.
4  The idea was intriguing so it seemed like
5  a reasonable investment.  At the present
6  time I can't recall any other companies
7  in which I have been a shareholder.
8      Q.   What was the company that
9  held the Maple Glen car wash?
10     A.   It was called Executive Car
11  Wash.
12     Q.   And was that a
13  privately-held company?
14     A.   Yes.
15     Q.   And were you the sole owner
16  of that one?
17     A.   Yes.
18     Q.   And were there any officers
19  or directors of that company?
20     A.   At the time I was the
21  president of the company.  Another
22  officer was my wife at the time.
23     Q.   What was her name?
24     A.   Marilyn.

17

1      Q.   Marily Pappas?
2      A.   Yes.  And I don't recall if
3  there were any other officers.  Which
4  brings up the other question, that I was
5  also a privately-held corporation of my
6  own practice.  So I was the sole owner of
7  a professional corporation, that is
8  Charles E. Pappas, M.D., which was wholly
9  owned, totally owned, by me as the
10  practitioner.
11     Q.   Your wife, did she have
12  ownership in Executive Car Wash?
13     A.   No.
14     Q.   So you held all the shares?
15     A.   Yes.
16     Q.   And what was her position?
17     A.   Appointed as secretary
18  treasurer.
19     Q.   And your title was
20  president?
21     A.   Yes.
22     Q.   Were there any directors?
23     A.   By law I believe you're
24  required to have a director, I don't

5 (Pages 14 to 17)

26

1    Q.   Did you have an attorney
2    involved?
3        A.   Yes.
4        Q.   And who was the attorney?
5        A.   That was Victor Meitner.
6        Q.   Did you know at the time of
7    your tour of the car wash how long this
8    operation had been a car wash?
9        A.   At that time I did not. But
10   I subsequently learned that it had become
11   a car wash in the early '80s, in '83 or
12   '84.
13       Q.   And at that time was that
14   owned by Mr. Haug?
15       A.   Yes.
16       Q.   Were you aware that prior to
17   the car wash that it was an ARCO service
18   station?
19       A.   I was not aware that it was
20   an ARCO service station.
21       Q.   So when you toured the
22   facility, did anyone go with you?
23       A.   I can't recall.
24       Q.   Was it operating at the

27

1    time?
2        A.   It had been operating
3    recently, but it had just been closed.
4    And my understanding of its closure was
5    that it was within a couple of days that
6    that property had ceased functioning,
7    mainly because of the current legal
8    issues that had arisen over the default.
9        Q.   When you toured the
10   property, did you just walk around the
11   outside?
12       A.   I walked around the outside
13   and I walked into the office because,
14   other than Mr. Narog who showed me the
15   property, I had no one with me.
16       Q.   So Mr. Narog was with you
17   when you toured the property?
18       A.   Yes.
19       Q.   And did Mr. Narog have the
20   keys to the facility?
21       A.   Yes.
22       Q.   And when you purchased this
23   property, did you finance it at all?
24       A.   Yes.

28

1        Q.   And what bank did you
2    finance it at?
3        A.   Fidelity Bank.
4        Q.   And did you obtain a
5    mortgage?
6        A.   Not at first. I believe the
7    purchase of the property was done with a
8    second on either my home, seashore home
9    or my office building. And it was done
10   out of some cash, some available savings
11   that I had, plus the second, which I had
12   established a line of credit to meet
13   purchase and development.
14       Q.   How much was the property?
15       A.   The original purchase price
16   was approximately, my best recollection
17   is, around $350,000.
18       Q.   And how much of that did you
19   finance?
20       A.   All of it. It was all
21   either the line of credit or personal
22   funds that I described, and I can't
23   recall the breakdown.
24       Q.   Did Fidelity have any

29

1    relationship with Marion Bank?
2        A.   Not to my knowledge.
3        Q.   So when you went to Fidelity
4    you said, "I want to buy this property,"
5    and they set up and put the loan into
6    process?
7        A.   Correct.
8        Q.   Was there any title search
9    done with regards to the property?
10       A.   My first recollection of
11   actual title search took place when I did
12   the permanent financing after
13   construction and rehabilitation, probably
14   in 1989, and the title search at that
15   point was done by Commonwealth Agency.
16       Q.   A Commonwealth of
17   Pennsylvania agency?
18       A.   Commonwealth Agency it's
19   called.
20       Q.   Okay. And did you hire this
21   agency to do the title search?
22       A.   Yes.
23       Q.   And did they provide you
24   with the results of that search?

8 (Pages 26 to 29)

30

1    A.   Yes.
2    Q.   And is that when you learned
3 that it had been an ARCO service station?
4    A.   Yes.  I had learned it was a
5 gas station; I don't recall when I
6 identified it as being ARCO.
7    Q.   Okay.
8    A.   But I learned it to be a
9 previous gas station.
10    Q.   So in 1989 at the time of
11 that title search you learned that the
12 site you were applying had been a gas
13 station?
14    A.   Yes.
15    Q.   Was Mr. Haug the owner of
16 the gas station at some point in time?
17    A.   I don't know.
18    Q.   At the time you did the
19 title search, did the bank require any
20 investigation into the prior gas station
21 business, such as underground storage
22 tanks or environmental issues with
23 regards to you acquiring that property?
24    A.   No.

31

1    Q.   The bank never asked for any
2 Phase 1, does that ring a bell, Phase 1
3 evaluation?
4    A.   Not when I did the initial
5 financing.
6    Q.   How about when you did the
7 permanent financing?
8    A.   When I refinanced in 1992,
9 it was the first time they had asked for
10 a Phase 1 study or an environmental
11 study.
12    Q.   And what bank asked for
13 that?
14    A.   I believe it was the same
15 bank I placed the permanent financing and
16 that was Fidelity Bank.  And at that
17 point they may have been called First
18 Union or First Fidelity, but I believe it
19 was called Fidelity Bank.
20    Q.   At the time you purchased
21 the property in 1988 did you acquire
22 insurance on the property?
23    A.   Yes, I did.
24    Q.   And who was the carrier?

32

1    A.   The carrier to the best of
2 my knowledge was Fireman's Fund.
3    Q.   Did you use an insurance
4 agent to acquire this?
5    A.   Yes.
6    Q.   Do you recall his name or
7 her name?
8    A.   No.
9    Q.   Do you recall the agency
10 name?
11    A.   The agency with whom I did
12 most business at that time for our
13 personal residence, for the seashore
14 residence and my office building was the
15 Paul Hertel Company.
16    Q.   How do you spell that last
17 name?
18    A.   H-e-r-t-e-l.
19    Q.   Okay.
20    A.   And if it was not they, it
21 could have been the Posse Walsh Company.
22 Posse is P-o-s-s-e, Walsh is W-a-l-s-h.
23    Q.   What's the address of the
24 Paul Hertel Company?

33

1        MR. KAPUSTIN:  3rd and
2 Walnut.
3        THE WITNESS:  Hertel, it's
4 on Walnut Street in Philadelhia.
5        MR. HAMILTON:  3rd and
6 Walnut?
7        MR. KAPUSTIN:  I think so.
8        THE WITNESS:  Yes.  And the
9 Posse Walsh Agency was located in
10 Blue Bell.
11 BY MR. HAMILTON:
12    Q.   Do you have the street name?
13    A.   I don't recall.
14    Q.   So you're saying that you
15 acquired your insurance for your personal
16 residence as well as your businesses
17 through one of those two agencies?
18    A.   Yes.
19    Q.   At the time you insured the
20 car wash property, did you fill out an
21 application for insurance?
22    A.   I don't recall.
23    Q.   Do you recall any discussion
24 with the agent regarding environmental

9 (Pages 30 to 33)

90

1  statement reflects the sale of this
2  property; is that correct?
3      A.  Yes.
4      Q.  And that would be the date
5  of this document, January 8, 2001?
6      A.  That's correct.
7      Q.  And you instituted legal
8  action against Mr. Carney on June 13,
9  2002; is that correct?  Mr. Carney's
10  company.
11      A.  Yes.
12      Q.  And at the time of your
13  instituting the legal action, you are not
14  the owner of the property any longer or
15  have any interest in that property; is
16  that correct?
17      A.  That's correct.
18      Q.  The document we have marked
19  as Pappas-2, is that familiar?  Are you
20  familiar with this document (indicating)?
21      A.  Yes, I am.
22      Q.  In the first column,
23  "Summary Of Borrower's Transaction," it
24  says "Gross Amount Due From Borrower:

91

1  $656,602.50."  Do you see that?
2      A.  Yes.
3      Q.  Is that how much you
4  received for the property?
5      A.  No.
6      Q.  How much did you sell the
7  property for?
8      A.  $418,000.
9      Q.  And was that money from
10  Mr. Sannuti or from Mr. Bets?
11      A.  $418,000 was received from
12  this agreement with Mr. Bets.
13      Q.  Okay.
14      A.  Mr. Sannuti exercised an
15  agreement with Mr. Bets I presume in
16  order to sell the property to him
17  directly.
18      Q.  So Mr. Sannuti got $238,000.
19  He got the difference from the $418,000
20  and the $656,00?
21      A.  I don't see the settlement
22  sheet here.  But if that's what you say,
23  it looks to me on the second page that --
24      Q.  If says, on line item 815

92

1  "Option To Purchase" "Sanco Ventures,"
2  "233,633"?
3      A.  Yes.
4      Q.  So that money went to
5  Mr. Sannuti, Sannuti's company?
6      A.  Sanco Ventures.
7      Q.  And that's because he had
8  already made a prior arrangement with you
9  on the lease purchase agreement; correct?
10      A.  Yes.
11      Q.  So you had already received
12  money from Mr. Sannuti in consideration
13  for that agreement?
14      A.  I had not already received
15  the payment.  His agreement with me was
16  to pay me $518,000 originally plus rent.
17  Because of the problems that occurred
18  here with this property, he reduced the
19  the price to $418,000 to me and didn't
20  pay the rent according to the schedule.
21  So what I received here was $100,000 less
22  than what I should have received.
23      Q.  Was there any upfront cash
24  from Mr. Sanutti at the time of the lease

93

1  purchase agreement?
2      A.  $50,000 for prepayment of
3  rent, yes.
4      Q.  For prepayment of rent.  So
5  then when he collected the rent he would
6  just keep it?
7      A.  He's not the lessor, he's
8  the lessee.
9      Q.  So you picked up $50,000?
10      A.  At the time of the lease
11  purchase application.
12      Q.  Plus another $418,000?
13      A.  Correct.
14      Q.  And on line 1308, this
15  $40,000 escrow, Gary Zlotnik, Esquire?
16      A.  Yes.
17      Q.  Is that the $40,000 that is
18  alluded to in the General Release, Pappas
19  document number 1?
20      A.  Yes, it is.
21      Q.  So this depicts -- you got
22  the $418,00 plus you got $50,000 in
23  settlement charges; is that correct?
24  Line 502 on the first page.