# EXHIBIT "A"

14

1 have you held prior to today that you no
2 longer hold?
3     A.   At one point in the 1982
4 through 1990 timeframe I owned an
5 investment property at the seashore in
6 New Jersey. And I owned a car wash
7 property in Maple Glen.
8     Q.   And is that the car wash
9 property that's at issue in this
10 litigation?
11     A.   Yes.
12     Q.   Are you a shareholder in any
13 privately-held companies presently?
14     A.   Presently, no.
15     Q.   Prior have you been a
16 shareholder in any privately-held
17 companies?
18     A.   Yes.
19     Q.   And what were they?
20     A.   I was a shareholder in a
21 company called Tri-State Quick Lube,
22 which was a corporation in which I was an
23 investor, whose purpose it was to
24 identify properties and open up

15

1 franchises in the quick lube business.
2     Q.   Is that like Jiffy Lube?
3     A.   Yes.
4     Q.   And when was that timeframe?
5     A.   Late '80s.
6     Q.   And how long were you in
7 that?
8     A.   A few years.
9     Q.   And did you divest yourself
10 of that?
11     A.   We were bought out of those
12 properties by the parent company, by the
13 Jiffy Lube parent, and at that time it
14 was Jiffy Lube and Pennzoil.
15     Q.   Are there any other
16 privately-held companies that you were an
17 owner of?
18     A.   I was an investor in a card
19 shuffling machine at one point in my
20 life. I was intrigued with the
21 technology that was involved, and the
22 idea was brought to me by a friend who
23 asked for the investment and made me a
24 shareholder in the company. And needless

16

1 to say, it has not gone very far. But
2 the design of the company was to obviate
3 card counting at the blackjack tables.
4 The idea was intriguing so it seemed like
5 a reasonable investment. At the present
6 time I can't recall any other companies
7 in which I have been a shareholder.
8     Q.   What was the company that
9 held the Maple Glen car wash?
10     A.   It was called Executive Car
11 Wash.
12     Q.   And was that a
13 privately-held company?
14     A.   Yes.
15     Q.   And were you the sole owner
16 of that one?
17     A.   Yes.
18     Q.   And were there any officers
19 or directors of that company?
20     A.   At the time I was the
21 president of the company. Another
22 officer was my wife at the time.
23     Q.   What was her name?
24     A.   Marilyn.

17

1     Q.   Marily Pappas?
2     A.   Yes. And I don't recall if
3 there were any other officers. Which
4 brings up the other question, that I was
5 also a privately-held corporation of my
6 own practice. So I was the sole owner of
7 a professional corporation, that is
8 Charles E. Pappas, M.D., which was wholly
9 owned, totally owned, by me as the
10 practitioner.
11     Q.   Your wife, did she have
12 ownership in Executive Car Wash?
13     A.   No.
14     Q.   So you held all the shares?
15     A.   Yes.
16     Q.   And what was her position?
17     A.   Appointed as secretary
18 treasurer.
19     Q.   And your title was
20 president?
21     A.   Yes.
22     Q.   Were there any directors?
23     A.   By law I believe you're
24 required to have a director, I don't

26

1  Q. Did you have an attorney
2  involved?
3  A. Yes.
4  Q. And who was the attorney?
5  A. That was Victor Meitner.
6  Q. Did you know at the time of
7  your tour of the car wash how long this
8  operation had been a car wash?
9  A. At that time I did not. But
10 I subsequently learned that it had become
11 a car wash in the early '80s, in '83 or
12 '84.
13 Q. And at that time was that
14 owned by Mr. Haug?
15 A. Yes.
16 Q. Were you aware that prior to
17 the car wash that it was an ARCO service
18 station?
19 A. I was not aware that it was
20 an ARCO service station.
21 Q. So when you toured the
22 facility, did anyone go with you?
23 A. I can't recall.
24 Q. Was it operating at the

27

1  time?
2  A. It had been operating
3  recently, but it had just been closed.
4  And my understanding of its closure was
5  that it was within a couple of days that
6  that property had ceased functioning,
7  mainly because of the current legal
8  issues that had arisen over the default.
9  Q. When you toured the
10 property, did you just walk around the
11 outside?
12 A. I walked around the outside
13 and I walked into the office because,
14 other than Mr. Narog who showed me the
15 property, I had no one with me.
16 Q. So Mr. Narog was with you
17 when you toured the property?
18 A. Yes.
19 Q. And did Mr. Narog have the
20 keys to the facility?
21 A. Yes.
22 Q. And when you purchased this
23 property, did you finance it at all?
24 A. Yes.

28

1  Q. And what bank did you
2  finance it at?
3  A. Fidelity Bank.
4  Q. And did you obtain a
5  mortgage?
6  A. Not at first. I believe the
7  purchase of the property was done with a
8  second on either my home, seashore home
9  or my office building. And it was done
10 out of some cash, some available savings
11 that I had, plus the second, which I had
12 established a line of credit to meet
13 purchase and development.
14 Q. How much was the property?
15 A. The original purchase price
16 was approximately, my best recollection
17 is, around $350,000.
18 Q. And how much of that did you
19 finance?
20 A. All of it. It was all
21 either the line of credit or personal
22 funds that I described, and I can't
23 recall the breakdown.
24 Q. Did Fidelity have any

29

1  relationship with Marion Bank?
2  A. Not to my knowledge.
3  Q. So when you went to Fidelity
4  you said, "I want to buy this property,"
5  and they set up and put the loan into
6  process?
7  A. Correct.
8  Q. Was there any title search
9  done with regards to the property?
10 A. My first recollection of
11 actual title search took place when I did
12 the permanent financing after
13 construction and rehabilitation, probably
14 in 1989, and the title search at that
15 point was done by Commonwealth Agency.
16 Q. A Commonwealth of
17 Pennsylvania agency?
18 A. Commonwealth Agency it's
19 called.
20 Q. Okay. And did you hire this
21 agency to do the title search?
22 A. Yes.
23 Q. And did they provide you
24 with the results of that search?

30

1  A. Yes.
2  Q. And is that when you learned
3  that it had been an ARCO service station?
4  A. Yes. I had learned it was a
5  gas station; I don't recall when I
6  identified it as being ARCO.
7  Q. Okay.
8  A. But I learned it to be a
9  previous gas station.
10 Q. So in 1989 at the time of
11 that title search you learned that the
12 site you were applying had been a gas
13 station?
14 A. Yes.
15 Q. Was Mr. Haug the owner of
16 the gas station at some point in time?
17 A. I don't know.
18 Q. At the time you did the
19 title search, did the bank require any
20 investigation into the prior gas station
21 business, such as underground storage
22 tanks or environmental issues with
23 regards to you acquiring that property?
24 A. No.

31

1  Q. The bank never asked for any
2  Phase 1, does that ring a bell, Phase 1
3  evaluation?
4  A. Not when I did the initial
5  financing.
6  Q. How about when you did the
7  permanent financing?
8  A. When I refinanced in 1992,
9  it was the first time they had asked for
10 a Phase 1 study or an environmental
11 study.
12 Q. And what bank asked for
13 that?
14 A. I believe it was the same
15 bank I placed the permanent financing and
16 that was Fidelity Bank. And at that
17 point they may have been called First
18 Union or First Fidelity, but I believe it
19 was called Fidelity Bank.
20 Q. At the time you purchased
21 the property in 1988 did you acquire
22 insurance on the property?
23 A. Yes, I did.
24 Q. And who was the carrier?

32

1  A. The carrier to the best of
2  my knowledge was Fireman's Fund.
3  Q. Did you use an insurance
4  agent to acquire this?
5  A. Yes.
6  Q. Do you recall his name or
7  her name?
8  A. No.
9  Q. Do you recall the agency
10 name?
11 A. The agency with whom I did
12 most business at that time for our
13 personal residence, for the seashore
14 residence and my office building was the
15 Paul Hertel Company.
16 Q. How do you spell that last
17 name?
18 A. H-e-r-t-e-l.
19 Q. Okay.
20 A. And if it was not they, it
21 could have been the Posse Walsh Company.
22 Posse is P-o-s-s-e, Walsh is W-a-l-s-h.
23 Q. What's the address of the
24 Paul Hertel Company?

33

1       MR. KAPUSTIN: 3rd and
2  Walnut.
3       THE WITNESS: Hertel, it's
4  on Walnut Street in Philadelhia.
5       MR. HAMILTON: 3rd and
6  Walnut?
7       MR. KAPUSTIN: I think so.
8       THE WITNESS: Yes. And the
9  Posse Walsh Agency was located in
10 Blue Bell.
11 BY MR. HAMILTON:
12 Q. Do you have the street name?
13 A. I don't recall.
14 Q. So you're saying that you
15 acquired your insurance for your personal
16 residence as well as your businesses
17 through one of those two agencies?
18 A. Yes.
19 Q. At the time you insured the
20 car wash property, did you fill out an
21 application for insurance?
22 A. I don't recall.
23 Q. Do you recall any discussion
24 with the agent regarding environmental

90

1 statement reflects the sale of this
2 property; is that correct?
3    A.  Yes.
4    Q.  And that would be the date
5 of this document, January 8, 2001?
6    A.  That's correct.
7    Q.  And you instituted legal
8 action against Mr. Carney on June 13,
9 2002; is that correct?  Mr. Carney's
10 company.
11    A.  Yes.
12    Q.  And at the time of your
13 instituting the legal action, you are not
14 the owner of the property any longer or
15 have any interest in that property; is
16 that correct?
17    A.  That's correct.
18    Q.  The document we have marked
19 as Pappas-2, is that familiar?  Are you
20 familiar with this document (indicating)?
21    A.  Yes, I am.
22    Q.  In the first column,
23 "Summary Of Borrower's Transaction," it
24 says "Gross Amount Due From Borrower:

91

1 $656,602.50."  Do you see that?
2    A.  Yes.
3    Q.  Is that how much you
4 received for the property?
5    A.  No.
6    Q.  How much did you sell the
7 property for?
8    A.  $418,000.
9    Q.  And was that money from
10 Mr. Sannuti or from Mr. Bets?
11    A.  $418,000 was received from
12 this agreement with Mr. Bets.
13    Q.  Okay.
14    A.  Mr. Sannuti exercised an
15 agreement with Mr. Bets I presume in
16 order to sell the property to him
17 directly.
18    Q.  So Mr. Sannuti got $238,000.
19 He got the difference from the $418,000
20 and the $656,00?
21    A.  I don't see the settlement
22 sheet here.  But if that's what you say,
23 it looks to me on the second page that --
24    Q.  If says, on line item 815

92

1 "Option To Purchase" "Sanco Ventures,"
2 "233,633"?
3    A.  Yes.
4    Q.  So that money went to
5 Mr. Sannuti, Sannuti's company?
6    A.  Sanco Ventures.
7    Q.  And that's because he had
8 already made a prior arrangement with you
9 on the lease purchase agreement; correct?
10    A.  Yes.
11    Q.  So you had already received
12 money from Mr. Sannuti in consideration
13 for that agreement?
14    A.  I had not already received
15 the payment.  His agreement with me was
16 to pay me $518,000 originally plus rent.
17 Because of the problems that occurred
18 here with this property, he reduced the
19 the price to $418,000 to me and didn't
20 pay the rent according to the schedule.
21 So what I received here was $100,000 less
22 than what I should have received.
23    Q.  Was there any upfront cash
24 from Mr. Sanutti at the time of the lease

93

1 purchase agreement?
2    A.  $50,000 for prepayment of
3 rent, yes.
4    Q.  For prepayment of rent.  So
5 then when he collected the rent he would
6 just keep it?
7    A.  He's not the lessor, he's
8 the lessee.
9    Q.  So you picked up $50,000?
10    A.  At the time of the lease
11 purchase application.
12    Q.  Plus another $418,000?
13    A.  Correct.
14    Q.  And on line 1308, this
15 $40,000 escrow, Gary Zlotnik, Esquire?
16    A.  Yes.
17    Q.  Is that the $40,000 that is
18 alluded to in the General Release, Pappas
19 document number 1?
20    A.  Yes, it is.
21    Q.  So this depicts -- you got
22 the $418,00 plus you got $50,000 in
23 settlement charges; is that correct?
24 Line 502 on the first page.