EXHIBIT B

1

```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                        -  -  -
EXECUTIVE CAR WASH    :
OF MAPLE GLEN         :
           PLAINTIFF  :
           v.         :    NO.  02-CV-3747
ENVIRONMENTAL, INC.   :
           and        :
ENVIRONMENTAL HAZARD  :
SERVICES, INC.        :
           DEFENDANTS :


                        -  -  -

              FEBRUARY 4, 2004
                        -  -  -


              Oral deposition of CHARLES
PAPPAS, taken pursuant to notice,
was held at the law office of Kaplin,
Stewart, Meloff, Reiter & Stein, P.C.,
350 Sentry Parkway, Building 640, Blue
Bell, Pennsylvania 19422 commencing at
1:49 p.m. on the above date, before
Stanley D. Krevitz, Jr., a court reporter
and notary public in the Commonwealth of
Pennsylvania.


                        -  -  -

           ESQUIRE DEPOSITION SERVICES
           1880 John F. Kennedy Boulevard
                   15th Floor
           Philadelphia, Pennsylvania 19103
                 (215) 988-9191
```


COPY

1          Q.      The bank never asked for any

2    Phase 1, does that ring a bell, Phase 1

3    evaluation?

4          A.      Not when I did the initial

5    financing.

6          Q.      How about when you did the

7    permanent financing?

8          A.      When I refinanced in 1992,

9    it was the first time they had asked for

10   a Phase 1 study or an environmental

11   study.

12         Q.      And what bank asked for

13   that?

14         A.      I believe it was the same

15   bank I placed the permanent financing and

16   that was Fidelity Bank.  And at that

17   point they may have been called First

18   Union or First Fidelity, but I believe it

19   was called Fidelity Bank.

20         Q.      At the time you purchased

21   the property in 1988 did you acquire

22   insurance on the property?

23         A.      Yes, I did.

24         Q.      And who was the carrier?

41

1  B-a-t-h, who actually came in and

2  revamped and reworked some of the work

3  done by O'Connell.  There was another

4  $50,000 or so required in their work.  In

5  addition to that, there was some site

6  work and improvements to the physical

7  structure of the building, an extension

8  of one of the sides of the building.  So

9  between architectrual engineering and

10 some of the other physical changes to the

11 building, including the bathroom and

12 other cosmetic events, the total project



13 cost, out of pocket, between personal

14 funds and bank, there's a line of credit,

15 it was approximately $625,000 to

16 $650,000.

17      Q.      And from 1988 to what year

18 did you expend this money?

19      A.      1992.

20      Q.      In 1989 you said you got

21 permanent financing?

22      A.      For the first portion of it.

23 It was permanent to the degree of which

24 it was secured partly by the property

43

1          Q.     Did they require any

2    insurance of you, proof of insurance, on

3    the property to cover environmental

4    issues?

5          A.     No.

6          Q.     Do you recall what insurance

7    coverages, not necessarily limits, just

8    what was covered under your insurance

9    policy?  General liability?

10         A.     Fire.

11         Q.     Personal liability?  Trip

12   and falls?



13         A.     I had personal liability,

14   yes.

15         Q.     Auto accidents?

16         A.     I believe there's also a

17   mechanics type of thing that occurs when

18   you're dealing with automobiles, so there

19   may have been some clause relating to

20   damage to an automobile as it goes

21   through the tunnel.

22         Q.     Do you recall the policy

23   carrying any exclusions or endorsements

24   regarding any type of environmental

56

1    details as to what was involved in their

2    report or their findings other than the

3    fact that what they were going to

4    ultimately do was satisfactory.

5            Q.      Do you know of Mr. Berkes?

6    Richard Berkes?

7            A.      No.

8            Q.      Does that name ring a bell

9    at all?

10           A.      No.

11           Q.      How about Dan Aquilino?

12           A.      No.

13           Q.      Are you aware that they're

14   the two gentleman that conducted the

15   Phase 1 examination?

16           A.      I had no contact with them.

17   The only person with whom I had contact

18   was Mr. Carney.

19           Q.      Okay.   Were you on the site

20   at all when Environmental Hazard came to

21   do the evaluation?

22           A.      No.

23           Q.      Who was the manager at that

24   time?

1          A.     I gave him a copy of my

2     original Phase 1.

3          Q.     From 1992?

4          A.     1992.

5          Q.     Okay.

6          A.     I represented to him

7     everything I knew.  And I said, If you

8     want another Phase 1 study, or Phase any

9     study, he's a good guy, call him.  And I

10    believe Sannuti contacted Mr. Carney

11    directly.

12         Q.     Okay.



13         A.     And I'm unclear as to the

14    actual sequence of phone calls, I don't

15    know if I called Mr. Carney and engaged

16    his services or Mike Sannuti did.  But in

17    either event, the purpose of the

18    subsequent environmental study was for

19    the sale to Mr. Bets, it was Mr. Bets

20    requesting the study.  There was not any

21    financing institution that Mr. Sannuti

22    was involved with that I was aware of,

23    and it wasn't that I was inquiring, it

24    was the subsequent owner and buyer.

1          Q.     So Mr. Sannuti had

2   Mr. Carney do a Phase 1; is that correct?

3          A.     Say that again.

4          Q.     Mr. Sannuti hired Mr. Carney

5   to do a Phase 1 evaluation in 2000?

6          A.     Yes.  He hired him to do a

7   study, and I suspect it was a Phase 1

8   study.

9          Q.     Okay.  And were you privy to

10  the outcome of that?

11         A.     Yes.  I think Mr. Sannuti

12  told me that Mr. Carney's findings were

13  satisfactory and he was pleased and

14  submitted the report to Mr. Bets.

15         Q.     Okay.  And what was your

16  knowledge as to why Mr. Bets wanted

17  something else?

18         A.     I was not involved in any

19  direct discussions with Bets and Sannuti.

20  The next I heard was that there was

21  another environmental company involved in

22  doing yet a second study, and I was

23  unclear why when asked.  I asked Sannuti

24  why and he said that some overseer



71

1   engineer that Bets uses required a more

2   detailed study; so I knew. Consequently

3   that was my first introduction to Roger

4   Edens and the Bell Environmental people,

5   because it was subsequent to those

6   discussions and their coming to the

7   property that I got involved in hearing

8   what was going on.

9           Q.      And what did you hear about

10  what they were doing? I guess they found

11  underground storage tanks?

12          A.      In some borings or

13  excavation of areas on the property, in

14  order to do their study, they hit a tank,

15  or what they felt was a tank. And that's

16  when I got a call from Michael Sannuti

17  that I had misrepresented to property to

18  him, that I had sold him a bill of goods,

19  that I was lying to him, and all of the

20  above things, that I was deceptive in my

21  anticipated agreement. And in trying to

22  quiet the situation, I went to the

23  property and met him when they were --

24  Mr. Carney or one of his designated



78

1  from them?

2          A.      I think the check from them

3  was about $90-some thousand dollars, of

4  which $8,000 or $9,000 was legal fees.

5  And half of which was escrowed by Sannuti

6  at the time of sale and the other half to

7  me.  So I got returned about $40,000.

8          Q.      And who was that settlement

9  with, do you recall?  What was it, ARCO,

10 Atlantic Richfield?

11         A.      I don't know the title of

12 the company.  I believe it was Atlantic

13 Richfield.

14         Q.      Do you have a copy of the

15 release?

16         A.      Yes.

17         MR. HAMILTON:  Can I have a

18         copy of the release?

19         MR. KAPUSTIN:  We'll take it

20         under consideration.

21 BY MR. HAMILTON:

22         Q.      Have you received settlement

23 from anyone else regarding this property?

24         A.      I received funds at the time



79

1    of sale of the property.

2           Q.     I mean, did you pursue any

3    litigation or claim against any other

4    company other than Atlantic Richfield?

5           A.     No.  Besides Mr. Carney, no.

6           Q.     Besides Mr. Carney?

7           A.     No.

8           Q.     Why have you pursued an

9    action against Environmental Hazard and

10   EHS Environmental?

11          A.     It seems very clear.  They

12   have caused me a great loss that has not

13   been compensated by the money I received

14   from ARCO.

15          Q.     And isn't it true that

16   Mr. Carney is not responsible for the

17   installation of the underground storage

18   tanks?

19          A.     I don't know who's

20   responsible.  If you're claiming he is

21   not responsible, I'll take that at face

22   value.  But I'm only going by the report

23   that he issued in 1992 that I had issued

24   to others who were contemplating



80

1    purchasing the property for a given

2    value, and this last person who was going

3    to buy it for a given value, it

4    compromised the purchase price

5    substantially both in rent and cost

6    accrued to fix this property and in the

7    cost of the ultimate conveyance of the

8    property because of the underground

9    storage tanks that were not disclosed

10   prior.  So it has cost me a couple

11   hundred thousand dollars above and beyond

12   what you're looking at.



13          Q.     Well, let's take for granted

14   Mr. Carney's company found the

15   underground storage tanks in 1992.  Would

16   you not be responsible in 1992 for their

17   removal?

18                MR. KAPUSTIN:  Object to the

19          form.  You can answer.

20                THE WITNESS:  Someone would

21          have been responsible for their

22          removal at that time.  And in 1992

23          I also had an agreement, a lease

24          purchase agreement, with an

88

1    scribble (indicating).

2        Q.    Yes.  But only that one has

3    his name typed underneath it.  And Gentle

4    Touch, Inc., is that Reinhards Bets?

5        A.    Yes.

6        Q.    And that's Reinhards Bets

7    personally and as Gentle Touch I presume.

8    Is this the $40,000 that you earlier

9    testified to regarding the money you

10   received from the Atlantic Richfield

11   settlement?

12       A.    This is the $40,000 that was

13   escrowed at the time of my settlement.

14       Q.    With Atlantic Richfield?

15       A.    Mr. Bets.

16       Q.    This is separate and apart

17   from the settlement with Atlantic

18   Richfield?

19       A.    This is money out of my

20   pocket to Mr. Bets.

21       Q.    It was held in escrow?

22       A.    Held in escrow for the

23   remediation of the property.

24       Q.    And if anything happens to



89

1    that property down the road regarding any

2    environmental problems, this protects you

3    from any liability from Mr. Bets?

4         A.    Correct.

5         Q.    And who prepared this

6    document for you?

7         A.    This document was prepared

8    by either Mr. Meitner or Mr. Cades.

9         Q.    And Mr. Cades was

10   Mr. Sannuti's attorney?

11        A.    Yes.

12            MR. HAMILTON:   Here's

13        another document Mr. Kapustin

14        produced, it's the settlement

15        statement, 259 and 260.   Mark this

16        as Pappas-2.

17                 -  -  -

18            (Pappas-2 was marked for

19        identification.)

20                 -  -  -

21   BY MR. HAMILTON:

22        Q.    Before I get to this

23   document, Doctor, I guess you sold the

24   property in -- I guess this settlement



90

1    statement reflects the sale of this

2    property; is that correct?

3           A.    Yes.

4           Q.    And that would be the date

5    of this document, January 8, 2001?

6           A.    That's correct.

7           Q.    And you instituted legal

8    action against Mr. Carney on June 13,

9    2002; is that correct?  Mr. Carney's

10   company.

11          A.    Yes.



12          Q.    And at the time of your

13   instituting the legal action, you are not

14   the owner of the property any longer or

15   have any interest in that property; is

16   that correct?

17          A.    That's correct.

18          Q.    The document we have marked

19   as Pappas-2, is that familiar?  Are you

20   familiar with this document (indicating)?

21          A.    Yes, I am.

22          Q.    In the first column,

23   "Summary Of Borrower's Transaction," it

24   says "Gross Amount Due From Borrower:

91

1    $656,602.50."   Do you see that?

2              A.    Yes.

3              Q.    Is that how much you

4    received for the property?

5              A.    No.

6              Q.    How much did you sell the

7    property for?

8              A.    $418,000.

9              Q.    And was that money from

10   Mr. Sannuti or from Mr. Bets?

11             A.    $418,000 was received from

12   this agreement with Mr. Bets.

13             Q.    Okay.

14             A.    Mr. Sannuti exercised an

15   agreement with Mr. Bets I presume in

16   order to sell the property to him

17   directly.

18             Q.    So Mr. Sannuti got $238,000.

19   He got the difference from the $418,000

20   and the $656,00?

21             A.    I don't see the settlement

22   sheet here.   But if that's what you say,

23   it looks to me on the second page that --

24             Q.    If says, on line item 815

92

1    "Option To Purchase" "Sanco Ventures,"

2    "233,633"?

3         A.    Yes.

4         Q.    So that money went to

5    Mr. Sannuti, Sannuti's company?

6         A.    Sanco Ventures.

7         Q.    And that's because he had

8    already made a prior arrangement with you

9    on the lease purchase agreement; correct?

10        A.    Yes.

11        Q.    So you had already received

12   money from Mr. Sannuti in consideration

13   for that agreement?

14        A.    I had not already received

15   the payment.  His agreement with me was

16   to pay me $518,000 originally plus rent.

17   Because of the problems that occurred

18   here with this property, he reduced the

19   the price to $418,000 to me and didn't

20   pay the rent according to the schedule.

21   So what I received here was $100,000 less

22   than what I should have received.

23        Q.    Was there any upfront cash

24   from Mr. Sanutti at the time of the lease

93

1    purchase agreement?

2         A.        $50,000 for prepayment of

3    rent, yes.

4         Q.        For prepayment of rent.  So

5    then when he collected the rent he would

6    just keep it?

7         A.        He's not the lessor, he's

8    the lessee.

9         Q.        So you picked up $50,000?

10        A.        At the time of the lease

11   purchase application.

12        Q.        Plus another $418,000?

13        A.        Correct.

14        Q.        And on line 1308, this

15   $40,000 escrow, Gary Zlotnik, Esquire?

16        A.        Yes.

17        Q.        Is that the $40,000 that is

18   alluded to in the General Release, Pappas

19   document number 1?

20        A.        Yes, it is.

21        Q.        So this depicts -- you got

22   the $418,00 plus you got $50,000 in

23   settlement charges; is that correct?

24   Line 502 on the first page.



112

1        A.        I paid what it was worth

2   (laughs).

3        Q.        You were satisfied with the

4   report and how much it cost?

5        A.        Yes, I paid.

6        Q.        But you had no involvement

7   in the selection of Atlantic Petroleum

8   Technologies?

9        A.        None whatsoever.

10        Q.        But when you read the report

11   you were aware that they had been

12   utilized by Environmental Hazard to do

13   that Fero Magnetic Locator test?

14              MR. KAPUSTIN:  Objection.

15        Is it indicated in the report?

16              MR. HAMILTON:  Yes, it is.

17              THE WITNESS:  Yes.

18   BY MR. HAMILTON:

19        Q.        In the report, section 4,

20   Executive Summary, it says "Underground

21   Storage Tanks."  Take a look at that.

22   That's where it alludes to it being a

23   prior ARCO station; is that correct?

24        A.        Yes.



113



1          Q.    And then it mentions that

2     Environmental Hazards utilized the

3     services of a Fero Magnetic Locator;

4     correct?

5          A.    Correct.

6               MR. KAPUSTIN:   Conducted a

7          site survey utilizing the Fero

8          Magnetic Locator.

9               THE WITNESS:   It did not say

10          anything about Atlantic Richfield

11          or Atlantic whatever company.

12               MR. HAMILTON:   Atlantic

13          Petroleum Technologies.

14               THE WITNESS:   Right.

15     BY MR. HAMILTON:

16          Q.    When did you become aware

17     that Atlantic Petroleum Technologies

18     utilized the Fero Magnetic Locator?

19          A.    I became aware that a

20     technique was used using a Fero Magnetic

21     Locator from the initial report in 1992.

22     I don't recall putting a name to the

23     company that actually did that until a

24     subsequent communication with

136

1   sheet (indicating).

2          A.     Correct.  I would guess that

3   the $40,000 would be on his.

4          Q.     Wouldn't that be from his to

5   Gentle Touch?

6          A.     Yes.

7          Q.     So the $40,000 came as a

8   result of the sale from him to Gentle

9   Touch, not from your proceeds?

10          A.     It was not from my proceeds.

11   However, it is reflected in my proceeds

12   because the sale price of the car wash

13   was reduced by $100,000.

14          Q.     But it's not substantiated

15   with an escrow of $80,000.  It's only

16   showing an escrow of $40,000?

17          A.     That's correct.  And as I

18   indicated, the other $40,000 of this

19   $80,000 was of course in escrow by

20   Mr. Sannuti.

21          Q.     There's a listing of

22   invoices paid to GCI Environmental

23   Services.

24          A.     Yes.



137

1          Q.      Did you pay those bills?

2          A.      They were paid from the

3    escrow.

4          Q.      From the escrow.  So who cut

5    the checks?  Mr. Zlotnik?

6          A.      Yes.

7          Q.      And are there copies of

8    those checks or copies of the invoices?

9          A.      No.

10         Q.      They're all depicted here in

11   numerical order?



12         A.      You'll see the invoices from

13   GCI to Mr. Zlotnik.  You'll see Zlotnik's

14   bills for the legal services.  You'll see

15   the bills from Bell Environmental.  As

16   indicated under item 1, there was $80,000

17   in escrow, and at the time this was

18   written there was $8,436 left.  The

19   remainder of the bills up to I think item

20   5 are bills that came through from

21   Zlotnik and they were paid by Zlotnik out

22   of the escrow, that's how I understand

23   it.  But if you're asking me are there

24   copies of Zlotnik's law firm check to

138

1  those entities, I've never been furnished

2  those copies.

3        Q.    I guess 2, 3 and 4 are also

4  payments to GCI, even though it's not

5  noted, because it lists invoice numbers?

6        A.    Yes.

7        Q.    Number 5, "Zarwin, Baum,

8  DeVito, Kaplan," what were they?

9        A.    That is Mr. Zlotnik's fees

10  for adminstrating this.

11        Q.    Escrow account?

12        A.    Yes.

13        Q.    And then there's another

14  bill, legal expenses to reconcile issues

15  with environmental company, Zlotnik and

16  EPA, that's $19,600. Did you pay that?

17        A.    I did not pay that. That

18  again came out of the escrow.

19        Q.    Unpaid rent June 1, 2000, to

20  January 1, 2000.

21        A.    It's more than this. But at

22  the time that this was presented, the

23  $44,000 was a guesstimate as to how much

24  rent had not been paid.

139

1          Q.      Didn't you get $50,000

2     advance for the rent?

3          A.      The total rent due during

4     the period of time of the agreeement was

5     $110,000.  I got $50,000, $60,000 has not

6     been paid.  As an accommodation to the

7     development of that property when Sannuti

8     was putting money into the rehab, as a

9     nice landlord I gave him a break and

10    said, "When you open again you'll pay

11    me."  But by the time they got around to

12    opening, he was under agreement and

13    determined that the property was now

14    being misrepresented to him, so in effect

15    he has stuck me for that rent.  And other

16    than that $50,000 that he paid, prepaid,

17    and reduced the price of the property

18    from $518,000 to $418,000.

19         Q.      So wouldn't you have a

20    course of action against Mr. Sannuti for

21    that?

22              MR. KAPUSTIN:  Object to

23         form.  You can answer.

24              THE WITNESS:  I see that I



140

1          might have an action against Mr.

2          Sannuti, but this would not have

3          been caused had the company not

4          been misrepresented.

5     BY MR. HAMILTON:

6          Q.    But in spite of that

7     allegation, Mr. Sannuti still owes you

8     the rent for that property?

9               MR. KAPUSTIN:   Same

10          objection.

11               MR. HAMILTON:   Correct?

12               MR. KAPUSTIN:   You can

13          answer.

14               THE WITNESS:   Yes.  He still

15          owes me that rent, it hasn't been

16          paid.

17     BY MR. HAMILTON:

18          Q.    Item D, "Loss of Business

19     for period June-January, $10,000 a

20     month."  That's unsubstantiated income.

21     Do you have tax returns to support that

22     you averaged $10,000 a month in income?

23          A.    I don't, but I have access

24     to tax returns that could.  And this is



141

1    an either/or, either you're a landlord or

2    an operator.  So in all honesty, if I'm

3    going to be paid rent, I'm not due any

4    profits unless I have some kind other a

5    lease that arranged that, but I do not.

6    So I wasn't paid rent.  But if I'm going

7    to operate the property and not be a

8    landord, I have a right to income from

9    that property and it would be

10   substantiated.

11            MR. HAMILTON:  In that

12       regard, I'd like to have copies of

13       tax returns for those respective

14       years and the prior years.

15            MR. KAPUSTIN:  For what

16       years?

17            MR. HAMILTON:  June through

18       January; I presume that's 2000 and

19       2001.

20            MR. KAPUSTIN:  But it wasn't

21       being operated during that time

22       period.

23            MR. HAMILTON:  But then the

24       prior years, used for averaging or



144

1      Q.    So in effect that's really

2 not --

3              MR. KAPUSTIN:  Objection.

4      It's argumentative.  You can

5      answer.

6              MR. HAMILTON:  It's really

7      not an out-of-pocket expense on

8      your part due to the litigation,

9      it would have had to have been

10     paid anyway.

11             MR. KAPUSTIN:  Same

12     objection.



13 BY MR. HAMILTON:

14     Q.    "Services from Bell

15 Environmental Services."  What are they

16 for.

17     A.    They were for the

18 determination, definition of the problem,

19 and the need for the subsequent

20 environmental Phase study that was done

21 by Bell.  And I had agreed with

22 Mr. Sannuti that I would pay half of

23 these fees.

24     Q.    And the bill was for

145

1    $33,000?

2              A.      Unfortunately, yes.

3              Q.      Did you hire Bell?

4              A.      No.

5              Q.      Who hired Bell?

6              A.      Mr. Sannuti hired Bell; and

7    he blamed me and the reports that he had

8    been furnished.

9              Q.      Do you know if Mr. Sannuti

10   had an interest in Bell Environmental?

11             A.      To my knowledge he does not.

12             Q.      And then the last item is

13   fees to Mr. Kapustin; is that correct?

14             A.      Yes.

15             Q.      At the time of your divorce

16   did your wife have any interest or effort

17   in gaining any income derived from the

18   car wash?

19                     MR. KAPUSTIN:  Object to the

20          form.

21                     THE WITNESS:  Income, sir?

22          I was not operating a car wash.

23          She had every right to a

24          percentage as determined in the



# A. Settlement Statement

U.S. Department of Housing
and Urban Development

OMB No. 2502-0265

| B. Type of Loan | | |
|---|---|---|
| 1.☐ FHA    2.☐ FmHA    3.☒ Conv. Unins.<br>4.☐ VA    5.☐ Conv. Ins. | 6. File Number<br>D284412 | 7. Loan Number |
| | | 8. Mortgage Insurance Case Number |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for information purposes and are not included in the totals.

| D. Name and Address of Borrower<br>GENTLE TOUCH, INC. | E. Name and Address of Seller<br>THE EXECUTIVE CAR WASH OF MAPLE GLEN, | F. Name and Address of Lender |
|---|---|---|

| G. Property Location<br>601 WELSH ROAD aka 400 N LIMEKILN PKE<br>UPPER DUBLIN TWP., MONTGOMERY COUNTY<br>$234,590<br>54-00-10180-00-8 | H. Settlement Agent<br>Trident Land Transfer<br><br>Place of Settlement<br>431 West Lancaster Avenue<br>Devon, PA 19333 | I. Settlement Date<br>01/08/01 |
|---|---|---|

| J. SUMMARY OF BORROWER'S TRANSACTION: | | K. SUMMARY OF SELLER'S TRANSACTION: | |
|---|---|---|---|
| 100. GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | 250,000.00 | 401. Contract sales price | 250,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 238,602.50 | 403. | |
| 104. | | 404. | |
| 105. Equipment Purchase | 168,000.00 | 405. Equipment Purchase | 168,000.00 |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes    to | | 406. City/town taxes    to | |
| 107. County taxes    to | | 407. County taxes    to | |
| 108. School taxes    to | | 408. School taxes    to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 656,602.50 | 420. GROSS AMOUNT DUE TO SELLER | 418,000.00 |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT TO SELLER | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | 50,444.12 |
| 203. Existing loan(s) taken subject to | | 503. Existing loans taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes    to | | 510. City/town taxes    to | |
| 211. County taxes    to | | 511. County taxes    to | |
| 212. School taxes    to | | 512. School taxes    to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. TOTAL PAID BY / FOR BORROWER | | 520. TOTAL REDUCTION AMOUNT DUE SELLER | 50,444.12 |
| 300. CASH AT SETTLEMENT FROM OR TO BORROWER | | 600. CASH AT SETTLEMENT TO OR FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 656,602.50 | 601. Gross amount due to seller (line 420) | 418,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | | 602. Less reduction amount due seller (line 520) | 50,444.12 |
| 303. CASH    FROM    BORROWER | 656,602.50 | 603. CASH    TO    SELLER | 367,555.88 |

SUBSTITUTE FORM 1099 SELLER STATEMENT. The information contained herein is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS determines that it has not been reported. The Contract Sales Price described on Line 401 above constitutes the Gross Proceeds of this transaction.

SELLER INSTRUCTIONS: To determine if you have to report the sale or exchange of your primary residence on your tax return, see the Schedule D (Form 1040) instructions. If the real estate was not your primary residence, complete the applicable parts of Form 4797, Form 6252, and for Schedule D (Form 1040).

THE EXECUTIVE CAR WASH OF MAPLE GLEN,
You are required by law to provide the settlement agent with your correct taxpayer identification number. If you do not provide your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law. Under penalties of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

Title _____

RESPA, HB 4305.2 - REV. 9/30\1/89)

File Number: D284412

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SETTLEMENT STATEMENT
PAGE 2

## L. SETTLEMENT CHARGES:

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| 700. TOTAL SALES/BROKER'S COMMISSION based on price $ @ % | | | |
| Division of commission (line 700) as follows: | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % | P.O.C. | | |
| 802. Loan Discount % | | | |
| 803. Appraisal Fee to | | | |
| 804. Credit Report to | | | |
| 805. Lender's Inspection Fee to | | | |
| 806. Mtg. Ins. Application Fee to | | | |
| 807. Assumption Fee to | | | |
| 808. | | | |
| 809. | | | |
| 810. | | | |
| 811. | | | |
| 812. | | | |
| 813. | | | |
| 814. | | | |
| 815. OPTION TO PURCHASE & Tax Adjus   SANCO VENTURES, INC. | | | 233,633.75 |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest from to @$ /day | | | |
| 902. Mortgage Insurance Premium to | | | |
| 903. Hazard Insurance Premium yrs. to | | | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER FOR** | | | |
| 1001. Hazard Insurance mo. @$ / mo. | | | |
| 1002. Mortgage Insurance mo. @$ / mo. | | | |
| 1003. City property taxes mo. @$ / mo. | | | |
| 1004. County property taxes mo. @$ / mo. | | | |
| 1005. School property taxes mo. @$ / mo. | | | |
| 1006. mo. @$ / mo. | | | |
| 1007. mo. @$ / mo. | | | |
| 1008. Aggregate Reserve for Hazard/Flood Ins, City/County Prop Taxes, Mortgage Ins & Annual Assessments | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee to | | | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to   WILLIAM M. LALLY | | | |
| 1107. Attorney's fees to   A. VICTOR MEITNER, JR. P.C. | | 50.00 | 50.00 |
| (includes above item No: | | | 7,760.00 |
| 1108. Title insurance to   Trident Land Transfer | | | |
| (includes above item No: | | 2,418.75 | |
| 1109. Lender's coverage -0- | | | |
| 1110. Owner's coverage $416,000 | | | |
| 1111. Ends. | | | |
| 1112. Closing Protection Letter   NONE | | | |
| 1113. | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording fees Deed $ ; Mortgage $ ; Releases $ | | | |
| 1202. City/county/stamps Deed $ 2,500.00 ; Mortgage $ | | | |
| 1203. State tax/stamps Deed $ 2,500.00 ; Mortgage $ | | | 2,500.00 |
| 1204. | | 2,500.00 | |
| 1205. | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey to | | | |
| 1302. Pest inspection to | | | |
| 1303. | | | |
| 1304. | | | |
| 1305. '99 Liened taxes   Montgomery County Tax Claim Bureau | | | 94.12 |
| 1306. TAX CERT FEES   Trident Land Transfer Co. | | | 40.00 |
| 1307. | | | |
| 1308. Gary Zlotnick, Esq.   Escrow | | | 40,000.00 |
| **1400. TOTAL SETTLEMENT CHARGES (enter on lines 103 and 502, Sections J and K)** | | 238,602.50 | 50,444.12 |

GENTLE TOUCH, INC

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

EXECUTIVE CAR WASH OF MAPLE GLEN.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Trident Land Transfer

Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010

RESPA, HB 4305.2 - REV. AUG(530)

EXHIBIT
2-4-04
Pappas-3
SK

| | | | |
|---|---|---|---|
| OPTION TO PURCHASE | | ₮ | 233,000 — |
| SCHOOL TAX 1-8 to 6-30-01 | T | | 1,663.⁵⁰ |
| Co-Twp 1-1 to 1-8 | — | | 24.⁴⁶ |
| WASTE MANAGEMENT 1-1 to 1-8 | — | | 5.²⁹ |
| | | | 233,633.²⁵ |

| | | | |
|---|---|---|---|
| Ck | GARY ZLOTNICK, ESQ — ESCROW | — | 40,000 — |
| Ck | LONNY CADES, ESQ — BANK CLEARANCE ESCROW | — | 15,000 — |
| Ck | " " " — STUCCO IMPROVEMENT | — | 1,000 — |
| | 11 MOS '99 LIENED TAXES | — | 5,356.⁵² |
| | 2000 Co-Twp TAX | — | 2,000 — |
| | 2000 School TAX | — | 4,500 — |
| | '99 WASTE | — | 261.⁸³ |
| | '2000 " | — | 241.⁴⁴  (68,359 |

$F$ 165,273.⁹⁶

| | | |
|---|---|---|
| Ck | MICHAEL SANNUTI | 5,000 — |
| Ck | " " | 21,500 — |
| Ck | LONNY CADES, ESQ | 15,000 — |
| Ck | MICHAEL SANNUTI | 123,773.⁹⁶ |
| | | 165,273.⁹⁶ |

EXCESS 2000 TAX ESCROW GOES TO MICHAEL SANNUTI

Approved By: _____   Agreed to, AND Received By: _____

Lease Purchase Agreement

THIS AGREEMENT is made as of the 15th day of April between MAPLE GLEN JIFFY WASH, INC., a Pennsylvania Corporation, a/k/a THE EXECUTIVE CAR WASH OF MAPLE GLEN, INC., and CHARLES PAPPAS, Individually (collectively referred to as "Seller") and Sannco Ventures LLC, and/or Nominees and MICHAEL SANNUTI, Individually (collectively referred to as "Buyer"). In consideration of the mutual promises contained herein and intending to be legally bound, the parties agree as follows:

ARTICLE 1: LEASE

1.1    *Premises.* Seller hereby leases to Buyer, which hereby rents from Seller, ALL THAT CERTAIN lot or piece of ground together with the buildings and all improvements erected thereon, as more fully described on the legal description attached hereto as Exhibit "A" and made a part hereof (hereinafter called "the Premises") known as 601 Welsh Road, a/k/a 400 Limekiln Pike, Upper Dublin Township, Montgomery County, Pennsylvania, and including all inventory and equipment ("the Equipment") situated thereon and associated with the car wash business conducted on the Premises (hereinafter called "the Business").

1.2    *Use.* The Premises may be used and occupied for the conduct of the Business.

1.3    *Term.* The term of Buyer's lease of the Premises hereunder (the "Term") shall commence on February 1, 1999 and shall expire at midnight on the Closing Date (hereinafter defined), unless otherwise extended or terminated pursuant to the terms hereof, and unless extended by the terms of this Agreement, or by mutual agreement of the parties shall expire at midnight on July 31, 2000.

1.4    *Rent.* Buyer shall pay to Seller the amount of Fifty Thousand dollars ($50,000.00), in cash or property receipt of which is hereby acknowledged for the lease term of February 1, 1999 to July 31, 2000 and is not refundable ~~if buyer defaults, however, if seller defaults for any reason, then seller must return monies applied to the property by the buyer.~~

UNDER ANY CIRCUMSTANCE.

4/26/95

1

1.5     *Maintenance, alterations and Repairs.*

(a)     Buyer shall be responsible, at its sole expense, for the maintenance, operation and repair of the Premises, including all lawns, shrubbery and paved areas, and the Equipment, and shall at all times keep the sidewalks, driveways and parking areas on the Premises clean and free of snow or ice accumulation. Should Seller hereafter be required by law of other duly constituted authority to make any alterations, improvements or other changes to the Premises or the Equipment, Buyer shall perform such changes at its sole expense.

(b)     Upon receipt of Seller's written consent, which shall not be unreasonably withheld and shall be deemed given if not refused in writing within five (5) business days following Buyer's written request therefor, Buyer, at its sole discretion and at its expense, may make alterations or modifications to the Premises which Buyer may deem appropriate. Buyer further agrees, as a condition of this lease, to spend not less than the sum of Fifty Thousand Dollars ($50,000.00) on the improvements to the Premises and in the event of default by buyer, then said improvements shall not reimbursed, however, if improvements  seller defaults, the seller must reimburse buyer of all reasonable improvement costs, *UP TO A TOTAL OF $100,000, INCLUDING DEPOSIT.*

(c)     Buyer shall pay all bills incurred by it in connection with the maintenance, alteration or repair of the Premises or the Equipment by the date such bills are due and payable, and, Buyer agrees to pay all real estate taxes, assessments, and all other costs and expenses relating the Premises, it being understood that this Lease is a "triple-net" lease, with Buyer agreeing to be responsible for and to pay all expenses.

(d)     Upon the termination or expiration of this Agreement pursuant to Section 2.11, Buyer shall promptly surrender the Premises and the Equipment in good condition, reasonable wear and tear excepted.

(e)     No alteration shall be undertaken by Buyer until it shall have first secured and paid for all permits and authorizations of all municipal departments and governmental subdivisions having jurisdiction. Any alterations by Buyer shall be made promptly (unavoidable delays expected) and in a good workmanlike manner and in compliance with all applicable permits, authorizations and building and zoning laws and with all other requirements of all governmental authorities having jurisdiction and of any national or

2

local board of fire underwriters or any other body hereafter
exercising functions similar to those of any of the foregoing.

(f)     The Premises shall at all times be free of liens for labor and
material supplied or claimed to have been supplied to the Premises
in conjunction with alterations performed by or for Buyer.  If any
mechanics' lien or other liens, charges or orders for the payment of
money shall be filed against Seller, the Premises or any portion
thereof on account of any alterations, maintenance or repair
performed by or for Buyer, Buyer shall indemnify and save
harmless Seller against and from all costs, liabilities, suits,
penalties, claims and demands, including reasonable counsel fees
resulting therefrom, and at Buyer's own cost and expense cause the
same to be discharged of record or bonded within ninety (90) days
after written notice from Seller to Buyer of the filing thereof.
Buyer shall not permit any mechanics' or similar liens to remain
upon the Premises on account of any such alterations,
modifications or repairs.  Buyer may, however, contest the validity
of any such lien or claim, provided Buyer shall upon demand give
Seller reasonable security to insure payment and to prevent any
sale, foreclosure or forfeiture of the Premises by reason of
nonpayment.  Upon the final determination of the validity of any
such lien or claim, Buyer shall immediately pay any judgment or
decree rendered against Buyer, Seller or the Premises, with all
proper costs and charges and shall cause the lien to be released of
record without costs to Seller.

1.6     *Compliance with Law.* Buyer shall at all times comply with the
requirements of all constituted public authorities and with the terms of any
state or federal statute or local ordinance or regulation applicable to the
Premises and the Equipment or Buyer's use thereof.

1.7     *Insurance.*

(a)     During the Term, Buyer shall maintain public liability
insurance with a minimum single limit for personal injury
of $1,000,000.00 for any one occurrence and of
$500,000.00 for property damage for any one occurrence.
Such insurance shall name both Buyer and Seller as
insureds, and shall not be cancelable with out at least thirty
(30) days written notice to Seller.

(b)     During the Term, Buyer shall maintain fire and extended
coverage insurance on the Premises in an amount at least
equal to the full replacement value of the Equipment and all
improvements erected upon the Premises as such

Exec 000371

improvements may exist from time to time, with insurance companies licensed to do business in the Commonwealth of Pennsylvania. Such insurance shall name Seller and Buyer as co-insureds as their interests may appear and shall provide that the proceeds of any loss shall be payable to Buyer and Seller jointly. Buyer shall, at its election, apply such proceeds either to the payment of the Purchase Price (hereinafter defined) at Closing, or to defray the cost of restoration of the Premises and the Equipment.

(c)    Upon execution of this Agreement, Buyer shall provide Seller with certificates of insurance in a form acceptable to Seller to the extent of the aforementioned limits and amounts, which certificates shall be subject to cancellation only upon thirty (30) days notice to Seller.

1.8    *Casualty.* Damage to or destruction of the Equipment or the improvements on the Premises or any portion thereof by fire or other casualty shall not terminate this Agreement, entitle Buyer to surrender the Premises, or to any abatement of or reduction in rent, or otherwise affect the respective obligations of Seller or Buyer.

1.9    *Inspection.* Seller or its agents or employees shall have the right to inspect the Premises and to enter the Premises at all reasonable times for the purpose of inspecting the Premises and the Equipment and making any repairs that may be necessary to cause the Premises and the Equipment to comply with the laws, rules or regulations of any governmental authority having jurisdiction or that may become necessary by reason of the failure of Buyer after notice provided in Subsection 1.10(b) of this Agreement to maintain the Premises and the Equipment as required under the terms of Subsection 1.5(a) of this Agreement.

1.10    *Default.* The occurrence of any one or more of the following events shall be considered an "Event of Default" hereunder:

(a) The failure of Buyer to pay an installment of rent or any other sum payable by Buyer hereunder within five (5) days after receipt from Landlord of written notice of nonpayment thereof; provided, however, that if Seller shall have give Buyer two (2) notices of nonpayment in any calendar year it shall thereafter, for the remainder of such calendar year, be an Event of Default if Buyer shall fail to pay any installment of rent or any other sum payable hereunder when due.

4

(b) The failure to perform, violation or breach by Buyer of any of the terms, covenants or conditions hereof, which failure, violation or breach shall continue unremedied by Buyer for a period of ten (10) days after written notice thereof shall have been given to Buyer by Seller, of for such additional period as may necessary to remedy such failure, violation or breach with due diligence.

(c) The insolvency of Buyer as evidenced by an assignment by Buyer for the benefit of creditors, a Petition in Bankruptcy being filed by Buyer, the adjudication of Buyer as a bankrupt, the filing against Buyer of a petition for appointment of a receiver of all or any part of Buyer's assets or property, either in bankruptcy or other insolvency proceedings, unless such proceedings shall be stayed or dismissed within sixty (60) days after the filing thereof, or the levy against any portion of the assets or property of Buyer by the Sheriff or other designated authority of any governmental subdivision having jurisdiction therefor.

1.11   *Effect of an Event of Default.* Upon the occurrence of any Event of Default, Seller shall have the remedies set forth in Section 2.11 hereof.

1.12   *Quiet Enjoyment.* Seller covenants that Seller has the right and authority to enter into this Agreement and that subject to covenants, easements and restrictions of record and the zoning, building and other ordinances or requirements of the Township of Upper Dublin, Montgomery County, Pennsylvania, Buyer may peaceably and quietly have, hold and enjoy the Premises, provided that Buyer performs and fulfills all the terms, covenants and conditions of this Agreement.

## ARTICLE 2:SALE

2.1   *Sale of the Premises and Business.* Seller agrees to sell, assign, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms and conditions herein set forth, good, marketable, and insurable fee simple title to the Premises and the Business located thereon.

2.2    *Purchase Price.*

     (a)    Amount of Purchase Price. The total purchase price and first year's nonrefundable rent to be paid by Buyer to Seller for the Premises and the Business (the "Purchase Price") shall be the sum of Five Hundred and Fifteen Thousand Dollars ($515,000.00). The Buyer, upon signing of this agreement shall pay to Seller the sum of One Hundred Thousand Dollars ($100,000.00) in cash, certified check or property, receipt of which is hereby acknowledged, and the balance of Four Hundred and Fifteen Thousand Dollars ($415,000.00) in cash or certified check at the time of closing. The Purchase Price is allocated as follows:

| | |
|---|---|
| Purchase Price of Equipment & Business | $265,000.00 |
| Purchase Price of Premises | $250,000.00 |
| Total | $515,000.00 |

     (b)    Payment of Purchase Price. The Purchase Price shall be paid to the Seller as follows:

          (i)    Cash or check or property provided by Buyer to Seller on or before April 23, 1999 in the amount of One Hundred Thousand Dollars ($100,000.00), receipt of which is acknowledged upon signing of this Agreement by Seller not refundable if Buyer defaults, however, if Seller defaults for any reason, then Seller must return all deposit monies to Buyer within 30 days.

2.3    *Closing Documents to be Delivered by Seller.* At Closing, Seller shall deliver to Buyer all of the following:

     (a)    Deed. A special warranty deed (the "Deed"), duly executed, acknowledged, and in recordable form, conveying good, insurable and marketable title to the Premises to Buyer.

6

(b)     Bill of Sale. A bill of sale in form acceptable to Seller, duly executed, assigning and transferring title to the inventory, equipment or other personal property attached to or located on the Premises or the Improvements thereto to Buyer and warranty that such title is good, marketable and unencumbered.

(c)     Miscellaneous. Such other documents as reasonably may be required to fulfill Seller's obligations hereunder and effectuate the sale contemplated hereby.

2.4     *Closing.*

(a)     Place of Closing. The closing of this transaction ("Closing") shall be held at such place as the parties hereto may agree upon.

(b)     Closing Date. The "Closing Date" shall be on or before July 1, 2000.

2.5     *Representations and Warranties of Buyer.* Buyer makes the following representations and warranties to Seller, each of which representations shall survive Closing for the period of any statue of limitations applicable to it and shall not merge in the Deed:

(a)     Neither the execution and delivery of this Agreement nor compliance with the terms and conditions of this Agreement by Buyer will breach or conflict with any agreement or instrument to which Buyer is a party or by which it is bound, or constitutes a default thereunder; and the execution and delivery of this Agreement will not be in violation of or conflict with any of the terms of any law or regulation, order, judgment or decree applicable to Buyer, or to which Buyer is a party, or by which Buyer is bound.

(b)     There is no action, suit or proceeding pending, or, to the actual knowledge of Buyer, threatened against Buyer or any of them with respect to their ability to enter into this Agreement or complete the transactions contemplated hereby in any court or before any federal, state, county, or municipal department, bureau, commission, board or agency or other governmental instrumentality.

7

Exec 000325

(c)    During the Term of Buyer's lease of the Premises, Buyer will not store, treat or otherwise dispose of Hazardous Substances upon the Premises; provided, however, that Buyer may use those Hazardous Substances commonly employed in connection with the Business and Premises in a manner consistent with all governmental rules and regulations pertaining thereto.

(d)    Buyer agrees to indemnify, defend, save and hold harmless Seller, its heirs, successors and assigns (the "Indemnitees") from and against, and to reimburse the Indemnitees with respect to, any and all claims, demands, causes of action, loss, damage, liabilities, costs and expenses (including, reasonable attorney's fees and expenses, court cost and costs of appeals) asserted against or incurred by the indemnitees by reason of or arising out of a breach of any of the representations and warranties of Buyer set forth in this Agreement, provided that the loss or damage shall be fore direct loss and damages sustained and not consequential damages. Buyer shall not be responsible for any environmental claims, which have been deemed to have occurred prior to February 1, 1999.

2.6    *Zoning Classification.* Seller states that the zoning classification of the Premises is Shopping Center (SC) and the most recent use of the Premises for a car wash is permitted by current, applicable zoning laws. Seller certifies that there are not outstanding notices received by it or of which Seller has actual knowledge, of any uncorrected violation of any housing, building, safety or fire ordinances applicable to the Premises.

2.7    *Conditions of Premises.* Buyer acknowledges and understands that Seller is not making any warranty, express or implied, with respect to the quality, condition or fitness for a particular purpose of any of the Premises or business including, without limitation, equipment and fixtures, and Buyer accepts all of the Premises and business "AS IS" and "WITH ALL FAULTS" IN THE CONDITION EXISTING ON THE DATE OF SIGNING THIS AGREEMENT AND THROUGH THE CLOSING DATE AND, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER EXPRESSLY DISCLAIMS TO BUYER AND TO ALL THIRD PARTIES ANY AND ALL WARRANTIES CONCERNING THE CONDITION OF THE PREMISES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, (A) ANY IMPLIED OR EXPRESS WARRANTY OF QUALITY, CONDITION OR MERCHANTABILITY, AND (B) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

Exec 000326

2.8    *Release and Indemnity.*

        (a) Buyer's Acknowledgement. It is the intent of the parties hereto, and Buyer so acknowledges, that from and after the execution of this Agreement, Seller shall bear no liability of any kind whatsoever arising form or associated in any way with the Premises and Business that are the subject of this Agreement, except for any liability that occurred prior to February 1, 1999. Therefore, Buyer agrees to release and indemnify Seller pursuant to the following provisions.

        (b) Release and Indemnity. Buyer for itself, its successors and assigns, hereby releases and forever discharges Seller, its partners, employees, servants, agents and their respective successors and assigns (the exonerate, indemnify, defend, protect and save the Released Parties harmless from and against any an all claims, losses, liabilities, demands, causes of action, suits judgments, orders, damages, penalties, obligation, costs, including reasonable attorneys' frees, and expenses of every kind and nature, whether or not covered by insurance (collectively "Claim"), which Buyer may have against the Released Parties, arising from or associated in nay way with the Premises and the business which are the subject of this Agreement, whether or not such Claims arose or accrued before the date of this Agreement or arise or accrue hereafter, and regardless of whether such claims are caused solely or in part by the negligence of misconduct of the Released Parties, including but not limited to claims arising out of or in connection with (i) loss of life, bodily injury, personal injury or damages to person, (ii) damages to or loss of personal property or real property, (iii) any violation of any statues, laws, ordinances, codes, rules or regulations of any government entity, (iv) any contamination or adverse effects on the environment, (v) other casualty or harm to air, ground water or other natural resources, the property or off-site property, and (vi) any costs of investigation, clean-up, preventative, restorative or mitigating measures, consultants and expert witnesses, court costs, administrative costs, costs of appeals and all fines and penalties that arise from or are in any way associated with the Premises and the Business that are the subject of this Agreement. This release and indemnity shall survive termination of this Agreement and delivery of the deed and any other instruments associated with the conveyance of the Premises and the Business to the Buyer. The Buyer is not responsible for any liability or claims prior to February 1, 1999

9

Exec 000327

and the Seller will allow all inspections as required by buyers lender.

(c) Statutory Waiver. With respect to any and all claims brought against a Released party by an employee of Buyer, Buyer for itself, its successors and assigns, hereby expressly agrees to waive any provision of the Worker's compensation Act whereby Buyer could otherwise preclude Buyer's joinder as an additional defendant, or avoid liability in any action at law or in equity or otherwise, where Buyer's employees, their heirs, assigns or anyone otherwise entitle to receive damages by reason of injury or death, brings and action against any Indemnified Party. The indemnification obligations accepted by Buyer under this Section shall not be limited in any way by any limitations on the amount of or type of damages, compensation or benefits payable by Buyer pursuant to the Worker's Compensation Act or Disability Benefit Act or any other employee benefit law, rule or regulation. Buyers agrees and acknowledges that by undertaking to indemnify a Released Party under this Section, Buyer is expressly undertaking indemnification liability by written contact pursuant to Section 303(b) of the Workers Compensation Act.

2.9     *Closing Documents to be Delivered by Buyer.* At closing, Buyer shall deliver or caused to be delivered to seller the Purchase Price, as adjusted in accordance with the provisions of this Agreement, and all other documents reasonably required for the consummation of the transaction contemplated hereunder.

2.10    *Taxes.* Transfer Taxes. Seller and Buyer shall each pay one-half (1/2) of any and all realty transfer taxes or conveyancing fees due any local or state governmental entity or authority in connection with the recording of the Deed or otherwise in connection with the consummation of the transactions contemplated by this Agreement.

2.11    *Default of Buyer.* Seller shall provide (20) twenty days written notice of default to Buyer. If, on the Closing Date, Buyer shall fail to perform its obligation hereunder in accordance with the terms of this Agreement Seller may either (i) terminated this Agreement, whereupon the Seller shall retain all rent and deposits theretofore paid by buyer hereunder the Buyer shall immediately vacate the Premises, or (ii) bring suit against Buyer for specific performance of is obligations under this Agreement. In addition, Seller shall be entitled to pursue all other remedies available in law or equity for any damages, costs and expenses that Seller may have sustained by reason of Buyer's default.

10

Exec 000328

(a) Upon Seller's termination of this Agreement pursuant to this Section 2.1, any Prothonotary or attorney of any court of record is hereby irrevocably authorized and empowered to appear for Buyer in any action to confess judgment against Buyer, and may sign for Buyer an agreement, for which this Agreement shall be his sufficient warrant, for entering in any competent court an action or actions in Ejectment, and any suits or in said actions to confess judgment against Buyer as well as all persons claiming by, through or under buyer for the recovery by Seller of possession of the Premises.

(b) In any confession of judgment for Ejectment, Seller shall cause to be filed in such action an affidavit setting forth the facts necessary to authorize the entry of judgment and if a true copy of this Agreement (and of the truth of the copy, such affidavit shall be sufficient proof) be filed in such action, it shall not be necessary to file the original as a warrant of attorney notwithstanding any law, rule of court, custom or practice to the contrary.  Buyer releases to Seller, and to any and all attorneys who may appear for Buyer, all procedural errors in any proceedings taken by Seller, whether by virtue of the powers of attorney contained in this Agreement or not, and all liability therefore. Buyer expressly waives the benefits of all laws, now or hereafter in force, exempting any property within the Premises or elsewhere from levy or sale. Buyer further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord Tenant Act of April 6, 1951, as amended or similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

2.12 *Sellers Default.* If, on the Closing Date, Seller shall fail to perform its Obligations hereunder in accordance with the term of this Agreement, Seller shall return all deposit monies and reimburse all reasonable expenses to buyer within thirty (30) days.

(a)

## ARTICLE 3: MISCELLANEOUS

3.1 *Notices.* All notices, requests and other communications under this Agreement shall be in writing and shall be sent by registered or certified mail, return receipt requested, postage prepaid, or by receipted hand delivery addressed as follows:

11

If intended for Seller:

C/O Charles Pappas, 1357 Gypsy Hill Road, Gwynedd Valley, PA 19437 with a copy to A. Victor Meitner, Jr. Esquire, 50 Skippack Pike, Broad Axe, PA 19002

If intended for Buyer:

C/o Sannco Ventures LLC, and/or its Nominee, 80 Second Street Pike, Southampton, PA 18966, with a copy to Gregory Javardian, 44 Second Street Pike, Suite 203, Southampton, PA 18966,

or to such other address or addresses or party or parties of which Sellers or Buyer shall have given notice as herein provided. All such notices, request or other communications shall be deemed to have been sufficiently given for all purposes hereof on the date of the proper mailing thereof, and my be give on behalf of any party by its respective counsel.

3.2    *Modification.*   This Agreement may be modified only by a written agreement signed by all parties.

3.3    *Captions.*   The captions and headings in this Agreement are inserted for convenience of reference only, and in no way define, describe, or limit the scope or intent of this Agreement or any of the provisions hereof.

3.4    *Time Periods.*   Any time periods provided herein which shall end on a Saturday, Sunday, or legal holiday, shall extend to 5:00 p.m. of the next full business day. All times specified in this Agreement shall be deemed of the essence of this Agreement.

3.5    *Counterparts.*   This Agreement may be executed in any number of identical counterparts, all of which evidence only one agreement and only one of which need be produced for any purpose.

3.6    *Whole Agreement.*   All understandings and agreements heretofore had between the parties hereto, whether oral or written, are merged into this Agreement which alone fully and completely expresses their agreement.

3.7    *Severability.*   If any provision of this Agreement shall be declared invalid by judicial determination or by express act of any legislative body with authority to affect this Agreement, only such provision so declared invalid shall be thus affected, and all other provisions not inconsistent therewith or directly dependent thereon shall remain in full force and effect.

3.8    *Governing Law.*   This Agreement shall be governed by and interpreted and enforced with the laws of the Commonwealth of Pennsylvania.

Exec 000330

3.9   *Time of the Essence.*   Time is of the essence in regard to the performance of the duties and obligations of the parties to this Agreement.

3.10   *Assignment.*   This Agreement shall be binding upon the respective heirs, executors, administrators, successors and, to the extent assignable, on the assigns of the parties hereto, it being expressly understood, however, that the Buyer shall not transfer or assign this Agreement without first obtaining the written consent of the Seller.

3.11   *Condemnation.*  If at or prior to Closing, all or any portion of the Premises is taken by exercise of eminent domain or condemnation, Seller shall give prompt written notice thereof to Buyer and Buyer shall have the option of either: (I) declaring this Agreement terminated by giving notice to Seller, in which event this Agreement shall be void and neither party hereto shall have any further obligation to the other pursuant to this Agreement; or (ii) accepting the deed and bill of sale to be executed and delivered in accordance with the terms of this Agreement upon payment of the Purchase Price without any abatement by reason of such taking or condemnation provided, however, that Seller shall, at Closing, turn over and deliver to Buyer the net proceeds of any award or other proceeds of such taking which may have been collected by Seller as a result of such taking, or if no award or other proceeds shall have been collected by Seller or Seller's agents, deliver to Buyer an assignment of Seller's right to any such award or other proceeds which may be payable as a result of such taking.

3.12   *Brokers.*  Each of Buyer and Seller represents and warrants to the other that no broker or real estate sales person has shown the Buyer the Property or called the property to Buyer's attention, and each party will indemnify and hold harmless the other against any liability which such other party is legally obligated to discharge to any broker which is imposed on said party wholly or partly because of the other's relations or contact with such broker or its representative or other person, together with all reasonable legal expenses and costs of that party necessitated in connection therewith.

3.13   *Limitation of Seller's Liability.*  As a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees that Buyer's recourse to Seller for all claims under this Agreement shall be strictly limited to Seller's interest in the Premises, the Business and the Equipment and that neither Seller, nor any of its principles or shareholders shall have any personal liability to Buyer under this Agreement. Buyer further acknowledges and agrees that the provisions of this section 3.13 shall in no respect alter, waive or diminish the release and indemnity protection accorded to Seller under Section 2.8 of this Agreement.

3.14   *Extension of Lease and Purchase.* This lease and the right to purchase the Premises may be extended by the Buyer upon written notice to Seller for an additional time of six (6) months from July 31, 2000 or until January 31, 2001, upon the following terms and conditions:

    (a)   That Buyer will pay to Seller the sum of Five Thousand Three Hundred Dollars ($5,300.00) **per month for each** month that the lease purchase agreement is extended; and,

    (b)   If Buyer completes closing before July 31, 2000, Buyer shall receive a credit against the purchase price in the amount of $3,500.00 for each month before April 1, 2000 that closing occurs, but subject to a maximum credit of $17,500.00.

3.15   *No Recording.* This Agreement may not be recorded.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have executed this Agreement on the day and year first above written.

SELLER:

MAPLE GLEN JIFFY WASH, INC., a/k/a THE EXECUTIVE CAR WASH OF MAPLE GLEN, INC.

BY: _____
    CHARLES PAPPAS, PRESIDENT

_____
CHARLES PAPPAS, INDIVIDUALLY

BUYER:

SANNCO VENTURES, LLC

BY: _____
    MICHAEL SANNUTI, PARTNER

BY: _____
    MICHAEL SANNUTI, INDIVIDUALLY

14